## STATE OF CONNECTICUT *v.* ANTHONY WILLIAMSON
### (5527)

DUPONT, C. J., DALY and NORCOTT, Js.

Argued November 17, 1987—decision released April 12, 1988

*Joette Katz,* public defender, for the appellant (defendant).

*Harry Weller,* deputy assistant state's attorney, with whom, on the brief, were *Robert Devlin,* assistant state's attorney, and *Jack Fischer,* legal intern, for the appellee (state).

DUPONT, C. J. The defendant appeals from the judgment of conviction, after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4). The defendant claims that the trial court erred (1) in refusing to strike the testimony of the victim because of the state's failure to produce her statements pursuant to Practice Book § 755,[1] and (2) in refusing to permit the defendant access to specific privileged communications contained in the victim's psychiatric and school records subpoenaed for use in the cross-examination of the victim. The defendant further claims that the state's final argument at trial denied him his constitutional rights to a fair trial and to due process of law. The defendant's first claim of error has merit and, therefore, we find error and remand the case for a new trial.

The jury reasonably could have found the following facts. The fifteen year old victim lived with her mother in an apartment building. On December 27, 1985, sometime during the afternoon hours, the victim left her apartment to go shopping with $50 her mother had given her. Instead of going immediately to shop, the victim went to visit a friend who lived on the third floor of a nearby apartment building. Upon discovering that her friend was not at home, the victim walked back down the stairwell to exit the building. When she had reached the bottom of the stairwell, a man grabbed her from behind and asked her if she had any money, to which the victim responded that she did not. Thereupon, the assailant pulled a gun from a gym bag he was carrying and held it behind the victim's ear. At this time, the victim recognized her assailant as the defendant, whom she had known for approximately ten years.

---

[1] Practice Book § 755 provides: "If the prosecuting authority elects not to comply with an order of the judicial authority to deliver to the defendant any statement of a witness who has testified or such portion thereof as the judicial authority may direct, the judicial authority shall strike from the record the testimony of the witness, and the trial shall proceed unless the judicial authority, in its discretion, upon motion of the defendant, determines that the interests of justice require that a mistrial be declared."

The defendant proceeded to search the victim, whereupon he discovered the $50 in her right jeans pocket. The defendant took the money, slowly backed away from the victim, and told her that if she told anyone about the robbery she would be hurt.

The victim reported the incident to the police on the telephone, but did not tell the police that the robber's name was that of the defendant until a police officer arrived at her home to investigate the incident. A short time later, the victim was transported to the New Haven police headquarters where she gave a taped statement and selected a photograph of the defendant from a book provided by the police.

At trial, the defendant claimed that the victim tried to lure him to a romantic rendezvous at her sister's vacant apartment. The defendant testified that the victim gave him a package of cocaine to bring to the apartment but instead he kept the cocaine. When the victim realized the defendant was not interested in a sexual interlude, she told him that she "knew how to handle it." According to the defendant, the victim was seeking revenge and fabricated the robbery incident.

The defendant first argues that the trial court erred in refusing to strike the victim's testimony because of the state's failure to produce her statements pursuant to Practice Book § 755.

The following facts are relevant to the defendant's claim. The victim first informed the state about the incident when she telephoned the New Haven police department using the 911 emergency number. The tape recording of this call was erased, in accordance with standard police procedure, approximately thirty-eight days after the alleged robbery. Following the 911 call, the victim was brought to the police station where Officer Whitney Epps took a taped statement. The victim was asked questions by him, which questions were spoken into a tape recording device. After each question, the officer turned off the machine and waited for the victim's response. He then reacti-

vated the machine and repeated her answer to each question into the tape recorder immediately after her response. No notes were taken during the taping procedure. The officer did not ask the victim to listen to the tape to confirm its accuracy. As was standard police practice, the tape was brought to a stenographer to type and the tape was thereafter destroyed. The officer testified that the policy of erasing tapes changed in December of 1985 while he was on vacation, that he had received a notice upon his return to that effect, but that he did not tell the typist to save the tape after it had been transcribed. The victim was never asked by the police to review the transcript of her statement. The victim first saw the transcript one day before the day of the trial and at trial attested to its accuracy.

The defendant moved to strike the victim's testimony due to the destruction of the 911 tape and of her taped statement. The trial court denied the defendant's motion, stating: "I think that with respect to the culpability of the police department, I don't believe that there was any intentional destruction of the tapes; there was no order to preserve the tapes. They were destroyed and it would be better if they had not been destroyed, but I don't believe there was any intention to thwart justice or to violate any rights of the defendant. But the principal thing, and I don't believe there was any substantial prejudice visited upon the defendant as a result of . . . our inability to have these tapes and other papers at the time of trial. The ultimate decision here is with respect to the jury and it was amply pointed out by counsel . . . and in the evidence that the tape had been destroyed, that there were discrepancies in the statements and it comes down to the bottom line that it's up to the jury to decide whether they'll believe the witness or not. And all of these other tapes and other things are simply ancillary to the defendant being able to pinpoint other discrepancies. And in my judgment, this has been done adequately so I don't

think there's any substantial prejudice to the defendant at all. And of course the extreme remedy that the defendant is seeking I don't think is warranted at all by what is offered here, so I'm going to overrule [the defendant's] motion to strike the testimony [of the victim]. With [that] . . . testimony still in, I think that there's sufficient evidence for the matter to go to the jury. So I will overrule [the defendant's] . . . motion to [strike]."

The discovery of prosecution witnesses' statements is governed by General Statutes § 54-86b, which provides in pertinent part: "In any criminal prosecution, after a witness called by the prosecution has testified on direct examination, the court shall on motion of the defendant order the prosecution to produce any statement oral or written of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified, and the court shall order said statement to be delivered directly to the defendant for his examination and use." This statutory provision is complemented by Practice Book § 752, which provides that "[a]fter a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

The preliminary question that this court must address is whether the 911 tape and the tape recording are encompassed by the disclosure provisions of General Statutes § 54-86b and Practice Book § 752. In order for material to fall within these disclosure provisions, they must qualify as "statements" within the meaning of § 752. The 911 tape and the tape recording qualify as "statements" pursuant to Practice Book

§ 749 (2), which provides that the term "statement" includes a "stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the meaning of such oral statement."

There are four remaining requirements in order for the mandates of General Statutes § 54-86b and Practice Book § 752 to apply and thereby compel discovery.[2] First, the witness whose prior statements are sought, must have been a witness for the prosecution and must have testified under direct examination. This condition is clearly met in this case. Second, the defendant must make a motion to the trial court for production of the witness' statement. The defendant has satisfied this condition. Third, the statements must relate to the subject matter about which the witness has testified. There is no dispute that this condition is also satisfied. Finally, the statements sought to be produced must be in the possession of the state or its agents. Although the 911 tape and the tape recording have been destroyed, they were originally in the possession of the New Haven police department, agents of the state. The provisions of § 54-86b and § 752, therefore, encompass the 911 tape and the tape recording.

The provisions of General Statutes § 54-86b and Practice Book §§ 748 et seq. are mandatory. *State* v. *Gonzales,* 186 Conn. 426, 431–32, 441 A.2d 852 (1982). Statements of potential witnesses which may be required to be produced and made available to the defense in a criminal trial must be preserved. *State* v. *Myers,* 193 Conn. 457, 468, 479 A.2d 199 (1984). In this case, it was foreseeable by the state and its agents that the victim's recorded statements would be required to

[2] These four criteria are extrapolated from the express language of the disclosure provisions set forth in General Statutes § 54-86b and Practice Book § 752.

be produced in the event of a trial. The police, therefore, were required to preserve the statements under the mandates of *State* v. *Myers*, supra. We emphasize that the destruction of the tapes in this case occurred fourteen months *after* the decision in *State* v. *Myers*, supra, a case which was decided in June, 1984. The 911 tape and the victim's recorded statements in this case were made in December, 1985, and destroyed sometime in February, 1986, by the same police department as was involved in *Myers*. The question, then, that we must decide is whether such destruction was done in bad faith; see, e.g., *State* v. *Santangelo*, 205 Conn. 578, 590, 534 A.2d 1175 (1987); *State* v. *Mullings*, 202 Conn. 1, 9-10, 519 A.2d 58 (1987); and, if so, whether the defendant was prejudiced from the nondisclosure sufficient to warrant reversal of his conviction. *State* v. *Milum*, 197 Conn. 602, 616, 500 A.2d 555 (1985).

The intentional destruction of tapes occurring prior to the decisions in *Myers* and *Milum* does not constitute bad faith as long as a verbatim transcript has been preserved. *State* v. *Mullings*, supra. The *Mullings* court articulated the rationale underlying the rule: "*Myers* could reasonably have been interpreted as excusing the erasure of tapes as long as a verbatim transcript was preserved. In *State* v. *Milum*, supra, 614-17, however, we reiterated our disapproval of the destruction of discoverable material even though in that case a transcript had been made from the tape which subsequently was erased." *State* v. *Mullings*, supra, 9. The destruction of the tapes in this case occurred three months *after* the decision in *State* v. *Milum*, supra, a case which was decided in November, 1985.

The precise question which must be decided here is whether the destruction of tapes occurring subsequent to the decision in *Milum*, as happened in the present case, may be viewed as having been done in bad faith. Our appellate courts have not defined "bad faith." We

are aware, however, that it has recently been decided that where the loss of tapes was the result of negligence, the destruction is not viewed as having been done in bad faith. *State* v. *Palmer,* 206 Conn. 40, 59, 536 A.2d 936 (1988) (tapes were "inadvertently lost through carelessness"). In such a case, "the question then becomes to what extent, if any, the defense was prejudiced by their loss. *State* v. *Myers,* supra, 469; *State* v. *Shaw,* [185 Conn. 372, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982)]." Id.

The present case does not involve negligent destruction but, rather, involves intentional destruction. We are aware that the trial court stated that it did not "believe that there was any intentional destruction of the tapes . . . ." When we read this statement in the context of the court's entire oration on the matter, it becomes apparent that the trial court gave a meaning to the word "intentional" different than its ordinary usage. In saying that the tapes were not intentionally destroyed, the trial court meant that the New Haven police department did not maliciously destroy the tapes intentionally to thwart justice or to violate the defendant's rights. The ordinary meaning of "intentional destruction" is a destruction with an intent to destroy, on purpose, with design to achieve the result of destruction. See Webster, Third New International Dictionary. This is the meaning which we have given to the words and the meaning which our cases give to the words. See e.g., *State* v. *Shaw,* supra, 386.

It is beyond question in this case that the tapes were not destroyed as the result of accident. Nor did the trial court find the destruction of the tapes to be negligent. In fact, it stated directly that "there was no order to preserve the tapes." Unlike the loss of the tapes in *State* v. *Palmer,* supra, the destruction here was not through inadvertence, carelessness or mistake. Rather, all of

the evidence indicates that at the time the typist destroyed the tape recording made by Epps, she erased that particular tape with the specific intent that it be erased so that it could be reused. Similarly, the 911 call tape was erased pursuant to police practice so that it could be reused. We, therefore, do not dispute any of the factual findings made by the trial court even though we conclude that the tapes were intentionally destroyed. The 911 call tape[3] and the tape recording made by Epps[4] were both destroyed in accordance with standard police procedures.

It is important to note that the destruction of the witnesses' statements by the New Haven police department was the subject of controversy in *State* v. *Myers,* supra, decided in June 1984; and *State* v. *Mullings,* supra, decided in January, 1987. The destruction of the tapes in this case by the New Haven police department occurred in February, 1987. We also note that subse-

---

[3] A reading of the new transcripts indicates that the court found the destruction of the 911 call tape not to have been a malicious destruction of evidence but, rather, destruction pursuant to a routine procedure of erasing and then reusing 911 tapes as a means of reducing costs.

[4] The state contends that the tape recording made by Epps was not destroyed pursuant to a standard police practice because the policy of erasing taped statements given at the police station had changed in December, 1985, to comport with the requirements of *State* v. *Myers,* 193 Conn. 457, 468, 499 A.2d 199 (1984), requiring an officer to save tapes even where verbatim transcripts had been made. We disagree. The transcripts demonstrate that (1) Epps received a notice that tape recordings of a potential witness' statements should not be erased but preserved, (2) Epps failed to tell the typist who transcribed the victim's statement to preserve the tape, and (3) in accordance with the previous long-standing practice of erasing tapes for reuse, the typist erased the tape. It is evident that at the time the tape was destroyed, the policy and accompanying order to erase tapes after their transcription was still in effect, unreplaced by the authority of a new policy. In order for there to be an actual change in policy, the change must be made known to those responsible for its enforcement and effectuation. Therefore, until a new order mandating the preservation of taped statements was sufficiently made known to *all individuals responsible* for such preservation, the new policy was not yet in effect. Accordingly, the tape recording made by Epps was destroyed pursuant to a standard police procedure of erasing tapes for subsequent use.

quent to the previous cases cited, and subsequent to the destruction of the tapes in this case, the destruction of a witness' statements by the New Haven police department was the subject of controversy in *State* v. *Santangelo,* supra, decided in December, 1987.

The mandatory provisions of the rules of practice and the General Statutes have been rendered ineffective by the state's intentional conduct in erasing discoverable material after sufficient and exhaustive warnings to comply with these provisions have been issued. Such violations can no longer be considered conduct performed in the absence of bad faith. See, e.g., *United States* v. *Bufalino,* 576 F.2d 446, 449 (2d Cir.), cert. denied, 439 U.S. 928, 99 S. Ct. 314, 58 L. Ed. 2d 321 (1978). "While we have decided that the special circumstances of the instant case militate against reversal on this ground, we will look with an exceedingly jaundiced eye upon future efforts to justify non-production of a . . . 'statement' by reference to 'department policy' or 'established practice' or anything of the like. There simply is no longer any excuse for official ignorance regarding the mandate of the law." Id.

The destruction in this case exhibits a *reckless disregard* for the defendant's rights under General Statutes § 54-86b, Practice Book §§ 751 et seq. and our Supreme Court's decisions in *State* v. *Myers,* supra, and its progeny. We conclude, therefore, that such destruction exhibited bad faith.

Where, as here, the destruction is done in bad faith,[5] the only relevant question becomes what prejudice, if

---

[5] In the absence of bad faith, the appellate courts will employ the balancing test set forth in *State* v. *Shaw,* 185 Conn. 372, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982), to determine whether the trial court erred in refusing to strike the testimony. That test weighs the culpability of the state for its failure to make disclosable material available on the one hand, against any resulting prejudice to the defendant on the other. *State* v. *Mullings,* 202 Conn. 1, 10, 519 A.2d

any, the defendant suffered as a result of the unavailability of the 911 call tape and the tape recording.[6] See, e.g., *State v. Santangelo,* supra. Ordinarily, the burden of establishing prejudice is a burden appropriately placed upon the defendant.[7] *State v. Palmer,* supra, 57. The destruction of the tapes in this case, however, constitutes bad faith and, therefore, the burden effectively shifted to the state to show that the defendant was not prejudiced by the erasure of the tapes. Cf. *State v. Thurman,* 10 Conn. App. 302, 313, 523 A.2d 891, cert. denied, 204 Conn. 805, 528 A.2d 1152 (1987) (where the trial court's instructions resulted in total noncompliance with a statutory provision, the state must prove that such noncompliance was harmless).

Our rules of practice are substantially patterned after those of the federal Jencks Act, 18 U.S.C. § 3500. *State v. Shaw,* supra, 385–86. The conclusion that the burden is on the state to show lack of prejudice is supported by federal cases interpreting the Jencks Act. The Court of Appeals for the Second Circuit, in *United States v. Bufalino,* supra, 449, stated: "Where, as here, destruc-

58 (1987). Even though it is the actions of a police department that may result in the unavailability of a witness' statement, the state is ultimately responsible for such loss and, therefore, the cases speak of the culpability of the state rather than solely the culpability of the police department. In this case, similarly, although the New Haven police department destroyed the tapes in reckless disregard for the defendant's rights, we attribute the conclusion of bad faith to the state.

[6] The defendant invites this court to adopt a per se rule of reversible error in view of the presence of bad faith. We decline to accept the defendant's invitation. Prejudice to the defendant is an indispensible element for a finding of reversible error because access to the statements of witnesses for the prosecuting authority is not a constitutional right. See *State v. Palmer,* 206 Conn. 40, 57, 536 A.2d 936 (1988); *State v. Myers,* 193 Conn. 457, 469 n.7, 479 A.2d 199 (1984).

[7] In *State v. Santangelo,* 205 Conn. 578, 590, 534 A.2d 1175 (1987), the court concluded that where the failure to preserve tapes is not the result of maliciousness or bad faith, the defendant must demonstrate a realistic possibility of prejudice in the cross-examination of the witness resulting from the erasure of the tapes in order to show reversible error.

tion is deliberate, sanctions will normally follow [see *United States* v. *Miranda,* 526 F.2d 1319, 1324 n.4 (2d Cir. 1975), cert. denied, 429 U.S. 821, 97 S. Ct. 69, 50 L. Ed. 2d 82 (1976) (listing possible sanctions)] irrespective of the perpetrator's motivation, unless the Government can bear the heavy burden of demonstrating that no prejudice resulted to the defendant." See also *United States* v. *Carrasco,* 537 F.2d 372, 376–79 (9th Cir. 1976); *Krilich* v. *United States,* 502 F.2d 680, 685–86 (7th Cir. 1974), cert. denied, 420 U.S. 992, 95 S. Ct. 1429, 43 L. Ed. 2d 673 (1975); cf. *Goldberg* v. *United States,* 425 U.S. 94, 111 n.21, 96 S. Ct. 1338, 47 L. Ed. 2d 603 (1976) ("[s]ince courts cannot 'speculate whether [Jencks material] would have been utilized effectively' at trial . . . the harmless error doctrine must be strictly applied in Jencks Act cases"). Therefore, the failure of the New Haven police to preserve the tapes of the 911 telephone call and the tape recording required the trial court to strike the testimony of the victim unless the state demonstrated that no prejudice resulted to the defendant.

The state has not met its burden of showing no prejudice occurring to the defendant from the erasure of the tapes.[8] This is a case in which the victim's testi-

---

[8] We are aware that in *State* v. *Santangelo,* 205 Conn. 578, 534 A.2d 1175 (1987), it was recently held that the routine destruction of a tape recording of a telephone call requesting police assistance, although inexcusable, did not prejudice the defendant. Id., 588–89. This case, however, is different from *Santangelo,* in three major respects.

First, *Santangelo* did not involve bad faith. Therefore, not only did the court apply a balancing test which considers both the culpability of the state and the prejudice to the defendant; see footnote 5, supra; but it also placed the burden of showing prejudice upon the defendant, see footnote 7, supra. In this case, because we conclude that the state acted in bad faith, we consider solely the question of prejudice to the defendant and place the burden upon the state to show that the defendant was not prejudiced by the destruction of the tapes.

Second, the reasons that the court gave for its decision in *Santangelo* do not apply here. In *Santangelo,* the court noted that (1) only a short period

mony was inconsistent with what she believed she had told investigating police officers about the alleged robbery incident. Furthermore, the victim's testimony as to certain events contradicted the testimony of the officers with whom she had spoken shortly after the incident as to those same events. The defendant argues that because the testimony revealed inconsistencies and contradicted other witnesses' testimony, the 911 call and the tape could have provided the most concrete sources of impeachment on cross-examination of the victim. The defendant further claims that although it is difficult to speculate as to the precise content of the erased tapes, other evidence at trial indicated that each time the victim reiterated the events, her description varied.

The state does not dispute that inconsistencies in the victim's testimony occurred nor does it dispute that there were contradictions between the other witnesses' testimony and that of the victim's. Rather, the state emphasizes that alternative sources of impeachment were utilized by the defendant at trial. The state cor-

---

of time had elapsed since *State* v. *Myers,* 193 Conn. 457, 479 A.2d 199 (1984), (2) a police report concerning the subject of the call for assistance was available, and (3) the crime involved was in the jurisdiction of another police department. In the present case, to the contrary, we note that (1) fourteen months had elapsed between the decision in *State* v. *Myers,* supra, and the intentional destruction of the tapes, (2) no police report concerning the subject of the 911 call was available to the defendant, and (3) the transmission of the 911 call and the related crime occurred in the jurisdiction of the same police department.

Third, and most important, the defendant in *Santangelo* merely stated in his brief that the destruction of the tape recording of the call for police assistance made by the witness "deprived him of an essential tool for cross-examination." *State* v. *Santangelo,* supra, 588–89. The defendant did not make any statement as to what might have been divulged had the tape been produced, nor as to how he was possibly prejudiced. Id., 589. In this case, however, the defendant set forth in detail the inconsistencies in the witness' testimony and how the erasure of the 911 call tape deprived him of a concrete source of impeachment, especially in light of the fact that no notes nor reports had been made relating to the call. In fact, the trial court admitted that "there were discrepancies in the statements." Accordingly, the result in *Santangelo* does not control here.

rectly notes that the defendant had access to reports from all three of the officers with whom the victim had spoken about the incident. The defendant had the report of the three officers, as well as the transcribed, adopted statement of the victim. The defendant used the inconsistencies in all of these reports to impeach the victim. The state claims, therefore, that these alternative sources of impeachment defeat the defendant's claim of prejudice. See *State* v. *Milum,* supra, 618.

Although the defendant did have some impeachment material with which to conduct his cross-examination, it is undisputed that the victim's version of the events varied each time she relayed it. The tape recording of the victim's interview with the police officer was the longest and presumably the most thorough description of the incident given outside the courtroom, and might have provided the defendant with a source of impeachment more concrete than the transcript which was never signed by the victim and first seen by her six months after the interview. Furthermore, no duplication of the 911 tape existed and no one other than the victim herself could testify about its content.

The inconsistencies are extensive. The existence of some impeachment material, therefore, does not eliminate the need for the victim's prior statements. The state has not met its burden of showing that the defendant was not prejudiced by the erasure of the tapes. We hold, therefore, that the trial court erred in not striking the testimony of the victim pursuant to Practice Book § 755.[9]

---

[9] The state also argues that the 911 emergency calls should be excepted from the mandates of Practice Book §§ 751 et seq., because the purpose of such an emergency system is not the prosecution of criminals but, rather, the protection of public safety. We do not agree with this proposition. When the 911 emergency telephone number is used by a member of the public to report a crime, the recording may relate to the investigation, apprehension, and prosecution of suspects of a crime as well as to the protection

Because a new trial is ordered, we need not address the remaining claims of error raised by the defendant.[10] *State* v. *Crane,* 169 Conn. 242, 246, 362 A.2d 843 (1975).

There is error, the judgment of conviction is set aside and the case is remanded for a new trial.

In this opinion the other judges concurred.

---

and aid of the victim of such crime. The burden of the maintenance and preservation of 911 call tapes is outweighed by the gains associated with fair trials and compliance with our practice book provisions. See *United States* v. *Bufalino,* 576 F.2d 446, 450 (7th Cir.), cert. denied, 439 U.S. 928, 99 S. Ct. 314, 58 L. Ed. 2d 1321 (1978).

[10] The defendant raises the claim that he is entitled to discovery of the victim's psychiatric and school records for the purpose of impeachment on cross-examination. Ordinarily, evidentiary issues will be reviewed if such issues are likely to arise at a new trial. See, e.g., *State* v. *Vinal,* 198 Conn. 644, 652–53, 504 A.2d 1364 (1986); *Devita* v. *Esposito,* 13 Conn. App. 101, 112, 535 A.2d 364 (1987). The evidentiary issue involved here, however, will not arise at a new trial and therefore we will not address it on the merits. In this case, the defendant argues that this court must award him access to specific privileged communications, e.g., the psychiatric and school records of the victim, for use in the cross-examination of the victim at the new trial. Our disposition of the defendant's first claim of error negates the need for access to the requested records. At the new trial the victim will not be allowed to testify on behalf of the prosecution because her testimony should have been stricken pursuant to Practice Book § 755. Since her testimony will be barred, there is no need for cross-examination of the witness and, hence, no need for access to records for the purpose of impeachment of the victim upon cross-examination.