STATE OF CONNECTICUT *v.* ANTHONY WILLIAMSON
(13510)

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL, Js.

Argued March 2—decision released July 4, 1989

*Harry Weller,* deputy assistant state's attorney, with whom, on the brief, was *Michael Dearington,* state's attorney, for the appellant (state).

*Joette Katz,* former public defender, for the appellee (defendant).

GLASS, J. This case presents us with no less than our sixth occasion since 1981 to consider whether the New Haven police department's destruction or loss of a witness' statements requires the striking of the witness' testimony in an ensuing criminal trial. See *State* v. *Kelly,* 208 Conn. 365, 545 A.2d 1048 (1988); *State* v. *Santangelo,* 205 Conn. 578, 534 A.2d 1175 (1987); *State* v. *Mullings,* 202 Conn. 1, 519 A.2d 58 (1987); *State* v.

*Myers,* 193 Conn. 457, 479 A.2d 199 (1984); *State* v. *Shaw,* 185 Conn. 372, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982); see also *State* v. *Sims,* 12 Conn. App. 239, 530 A.2d 1069 (1987), cert. denied, 206 Conn. 801, 535 A.2d 1315 (1988).

The state accused the defendant, Anthony Williamson, of having robbed the victim, Crystal Gray, at gunpoint. General Statutes § 53a-134 (a) (4).[1] Before the trial, the New Haven police erased tape recordings of Gray's initial 911 emergency telephone call to police and her subsequent interview with Detective Whitney Epps. At trial, the defendant moved to strike Gray's testimony, arguing that the destruction of the tapes violated Practice Book § 752 et seq.[2] and prejudiced

[1] General Statutes § 53a-134 (a) (4) provides in part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged."

[2] "[Practice Book] Sec. 752.—— ——PRODUCTION FOLLOWING TESTIMONY

"After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

"[Practice Book] Sec. 755.—— ——FAILURE TO COMPLY WITH ORDER

"If the prosecuting authority elects not to comply with an order of the judicial authority to deliver to the defendant any statement of a witness who has testified or such portion thereof as the judicial authority may direct, the judicial authority shall strike from the record the testimony of the witness, and the trial shall proceed unless the judicial authority, in his discretion, upon motion of the defendant, determines that the interests of justice require that a mistrial be declared."

Practice Book § 749 defines "statements" as "(1) A written statement made by a person and signed or otherwise adopted or approved by him; or (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement."

his defense. The trial court denied the defendant's motion. The jury found the defendant guilty as charged, and the trial court sentenced him to fifteen years imprisonment, execution suspended after twelve years, and five years probation. Upon the defendant's appeal, the Appellate Court determined that the trial court should have stricken Gray's testimony, and remanded the case for a new trial. *State* v. *Williamson,* 14 Conn. App. 108, 552 A.2d 815 (1988).

We granted the state's petition for certification, limited to the issues: (1) whether the destruction of the tapes so prejudiced the defendant that Gray's testimony should have been stricken; and (2) whether tape recorded 911 emergency telephone calls must be preserved on the chance they might be discoverable under Practice Book § 752. We now affirm the Appellate Court's judgment. Because we hold that the state's non-production of the Epps interview tape required the striking of Gray's testimony, we do not reach the issues pertaining to the 911 telephone call. See *SSM Associates Ltd. Partnership* v. *Plan & Zoning Commission,* 211 Conn. 331, 335, 559 A.2d 196 (1989).

The facts are fully set forth in the Appellate Court's opinion. *State* v. *Williamson,* supra. In brief, Gray testified at trial that on December 27, 1985, she went to visit a friend at an apartment building on Ashmun Street in New Haven. Her friend was not home. As Gray was leaving the building's lobby, the defendant, whom she had known for ten years, grabbed her from behind by placing his hands on her neck. He held a handgun behind her ear, took $50 from her pants pocket, and slowly backed away, exiting the building through the rear door. The defendant denied committing the robbery. He testified that he had gone to the Ashmun Street building to socialize with a friend, and encountered Gray there. He claimed that Gray had given him a packet of cocaine and had asked him to

meet her at another apartment building for a sexual tryst. When the defendant had walked away with the cocaine, showing no interest in her proposal, Gray had told him that she "knew how to handle the situation," and thereafter had fabricated the robbery story to avenge her spurned advances.

After the alleged robbery, Gray telephoned the New Haven police department's 911 emergency number. She testified that she told the person answering, "[C]ould you please send a cop to 192 Ashmun Street . . . I just got robbed." The telephone call was tape recorded. Officer Richard Rawling responded to Gray's call and later filed an incident report based on her statements. Rawling transported Gray to the police station, where Whitney Epps interviewed her. In a rather creative procedure, Epps conducted the interview by tape recording each question he asked Gray, shutting the recorder off while she answered, and then reactivating it to repeat her answers himself.[3] Gray testified at trial that Epps also had made written notes during the taped interview. Epps testified, however, that he had not made handwritten notes during the interview.

After completing the interview, Epps gave the tape recorded statement to a police department stenographer. The stenographer transcribed the recording on paper and then erased the tape. According to Epps, although he knew that department policy recently had changed to require the preservation of such tape recordings, he had neglected to tell the stenographer to save the recording. As a consequence, neither the police nor Gray ever compared the transcript with the original tape recording. Further, the police did not ask her to look at the transcript during the seven months between

---

[3] The defendant has raised no claims with regard to Epps' tape recording techniques.

the incident and the trial. When Gray finally did review the transcript on the first day of trial, she testified that it was accurate.

New Haven police arrested the defendant in February, 1986, and charged him with first degree robbery. In March, 1986, the trial court granted the defendant's motion to preserve evidence. By that time, however, neither tape could be produced, since the police had also erased the 911 recording approximately thirty-eight days after the alleged robbery, in accordance with police department routine. At trial, the defendant moved under Practice Book § 755 to strike Gray's testimony because of the destruction of the tapes. The trial court denied the motion, finding that the police had no "intention to thwart justice or to violate any rights of the defendant" in destroying the tapes. The trial court also found that the defendant had not been prejudiced because he had had adequate opportunity to expose inconsistencies between Gray's trial testimony and other statements she had made during the investigation. The defendant had also used the transcript of the Epps recording to challenge Gray's testimony.

On the defendant's appeal, the Appellate Court reversed, reasoning that, because the New Haven police department had intentionally and not inadvertently destroyed the tapes after publication of our decision in *State* v. *Milum,* 197 Conn. 602, 616, 500 A.2d 555 (1985), the "destruction exhibited bad faith." *State* v. *Williamson,* supra, 117. The court then held that, because the police had acted in bad faith, "the only relevant question becomes what prejudice, if any, the defendant suffered . . . . " Id., 117–18. The court also held that, although the defendant ordinarily must establish that he was prejudiced by the nonproduction of discoverable material; see *State* v. *Palmer,* 206 Conn. 40, 57, 536 A.2d 936 (1988); the burden of proof on the issue of prejudice shifted to the state because the tapes had

been destroyed in bad faith. See *United States* v. *Bufalino*, 576 F.2d 446, 449 (2d Cir.), cert. denied, 439 U.S. 928, 99 S. Ct. 314, 58 L. Ed. 2d 321 (1978). Finding that it was undisputed that Gray's "version of events varied each time she relayed it," the court ruled that the defendant's impeachment of Gray's testimony with prior statements given in other interviews with the police, as well as with the transcript of the Epps recording, did not render harmless the nonproduction of the two tapes. It therefore concluded that the trial court erred in failing to strike Gray's testimony. *State* v. *Williamson*, supra, 117–18C.

On certification, the state concedes that the defendant had the right to production of the Epps interview tape under Practice Book § 752. It claims, however, that its nonproduction of the tape was harmless. It asserts that the "verbatim" transcript of the Epps recording and other information enabled the defendant to expose "numerous inconsistencies" in Gray's testimony sufficient to satisfy the impeachment rationale of § 752, but not so great as to undermine the jury's verdict. Accordingly, in the state's view the Appellate Court erred in overturning the trial court's conclusion that the defendant did not suffer such prejudice as to require striking Gray's testimony. The state also claims that the Appellate Court erred in holding that the tape recording of the 911 emergency phone call should have been preserved for possible discovery under § 752. As an alternative ground for upholding the Appellate Court's decision, the defendant claims that Practice Book § 755 sanctions should be automatic once bad faith is established, a claim that the Appellate Court rejected. *State* v. *Williamson*, supra, 118 n.6.

I

We first address the defendant's claim that Gray's testimony should have been stricken automatically

because the New Haven police had acted in "bad faith" in erasing her tape recorded statements. The state concedes on certification that its nonproduction of the Epps recording constituted "bad faith." It claims, however, that the conduct of the New Haven police was not so egregious as to require an automatic § 755 sanction. The state argues that this court instead must balance the state's culpability against the defendant's prejudice. See *State* v. *Shaw,* supra, 386. We agree.

Practice Book § 752 provides that, after a state's witness has testified on direct examination, the trial court must, on the defendant's motion, "order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which . . . relates to the subject matter about which the witness has testified." Section 755 provides that, if the state "elects" to not comply with such an order, the trial court must strike the witness' testimony or, under appropriate circumstances, order a mistrial. The rules contained in these sections have been in effect since October 1, 1976. Because our rules are patterned on the Jencks Act, 18 U.S.C. § 3500, we have in the past looked to federal case law for guidance. *State* v. *Shaw,* supra.

It is beyond dispute that the state cannot avoid the discovery provisions of Practice Book § 752 by destroying discoverable material in its possession before the defendant moves for production. *United States* v. *Carrasco,* 537 F.2d 372, 377 (9th Cir. 1976). The provisions of §§ 752 and 755, "repeatedly employing the word 'shall,' are mandatory." *State* v. *Gonzales,* 186 Conn. 426, 432, 441 A.2d 852 (1982) (*Gonzales I*). This court has recognized, however, that not every violation of § 752 requires a § 755 sanction. Sanctions are unnecessary if nonproduction of the statement is harmless. *Rosenberg* v. *United States,* 360 U.S. 367, 371, 79 S. Ct. 1231, 3 L. Ed. 2d 1304 (1959); *State* v. *Shaw,* supra.

14

"In the absence of bad faith we employ a balancing test to determine whether sanctions should be imposed for the state's failure to produce the tape. . . . [Under *Shaw*,] [t]he balancing test weighs the culpability of the state for its failure to make disclosable material available on the one hand, against any resulting prejudice to the defendant on the other. *State* v. *Myers*, supra, 467, 469; *State* v. *Shaw*, [supra, 386]." *State* v. *Santangelo*, supra, 587–88; *State* v. *Mullings*, supra, 10. "We recognize that this approach gives broad discretion to the trial court. *State* v. *Shaw*, supra." *State* v. *Mullings*, supra. The nonproduction of the statement is harmful if it is likely that the nonproduction affected the result of the trial. Cf. *State* v. *Gonzales*, 196 Conn. 115, 119, 491 A.2d 1067 (1985) (*Gonzales II*).

In *State* v. *Mullings*, supra, 6, the New Haven police made a transcript of a witness' tape recorded statement and then destroyed the tape. This conduct occurred after our decision in *Myers*, but before our decision in *Milum*. We observed that, in *Milum*, "we reiterated our disapproval of the destruction of discoverable material even though in that case a transcript had been made from the tape which subsequently was erased." Id., 9. We ruled, however, that the New Haven police could reasonably have interpreted *Myers* to permit the erasure of a tape of which a transcript had been made. We concluded that because the New Haven police conduct at issue in *Mullings* occurred before *Milum*, the erasure of the tape could not be viewed "as having been done in bad faith." Id., 9–10; see also *State* v. *Santangelo*, supra, 589–90; cf. *State* v. *Vessichio*, 197 Conn. 644, 662, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986).

In the present case, the New Haven police erased the Epps tape in or around late December, 1985, shortly after the release of *Milum* on November 19, 1985. We

do not understand the state to argue seriously that the brevity of time between *Milum* and the conduct at issue here warrants a conclusion that, under *Mullings,* the New Haven police acted reasonably in erasing the Epps tape. Consequently, the mitigating circumstance recognized in *Mullings* is not present. Further, it is undisputed that the police deliberately destroyed the Epps tape. The state makes no claim that the police department erased the tape because of physical bungling or the like. Cf. *State* v. *Kelly,* supra, 384; *State* v. *Palmer,* supra, 58–59; see also *United States* v. *Sommer,* 815 F.2d 15, 16 (2d Cir. 1987) (state not culpable where notes of witness' grand jury testimony lost by court reporter). Further, although there was testimony that the New Haven police had adopted a policy of preserving such tapes just prior to the destruction of the Epps tape, the department's stenographer apparently had not been apprised of that new policy, or chose to disregard it.

Despite all these considerations, we decline to hold that the conduct of the New Haven police in the present case requires the striking of Gray's testimony without inquiry into the prejudice resulting to the defendant. " 'Suppression of relevant, material and otherwise admissible evidence is a severe sanction which should not be invoked lightly. . . . ' *State* v. *Festo,* [181 Conn. 254, 265, 435 A.2d 38 (1980)]." *State* v. *Perez,* 181 Conn. 299, 310, 435 A.2d 334 (1980). Our analysis in *Mullings* arguably suggests that the deliberate destruction of a discoverable tape recorded statement after *Milum* necessarily constitutes "bad faith." We are not persuaded, however, that a finding of "bad faith," as that term is meant in this context, is appropriate absent an evaluation of the particular conduct and intentions of the state agents involved. As we observed in *State* v. *Santangelo,* supra, 587, "[a]lthough . . . the destruction of the [taped statement] may have been inexcusa-

ble, there is no allegation that it was destroyed *maliciously or* in bad faith *to thwart the defense."* (Emphasis added.) We immediately noted thereafter that, "[i]n the absence of bad faith we employ [the *Shaw*] balancing test . . . ." *Id.* In the context of a § 752 violation,. therefore, the term "bad faith" connotes a deliberate act done with intent to deprive the defense of information. *State* v. *Santangelo,* supra; see also *United States* v. *Bryant,* 439 F.2d 642 (D.C. Cir. 1971) (recognizing that "intentional non-preservation" and "bad faith" are not synonomous).

In the present case, the trial court found that the New Haven police had not acted with the intent to thwart the defendant's defense. The Appellate Court did not impugn this finding. Further, the defendant has not claimed that the police destroyed the tapes with an intent to deprive him of information. In view of the trial court's unchallenged finding, we cannot conclude that the conduct of the New Haven police, although demonstrating a disturbing indifference to the rule of law, was such as to require an automatic sanction.

## II

Because the state's conduct in this case did not constitute "bad faith" as contemplated by *State* v. *Santangelo,* supra, we must weigh the state's culpability against any prejudice resulting to the defendant to determine whether the trial court abused its discretion in not striking Gray's testimony. *State* v. *Shaw,* supra; *State* v. *Santangelo,* supra; see 2 C. Wright, Federal Practice and Procedure: Criminal (2d Ed.) § 439, p. 613 (under Jencks Act question of sanctions cannot be considered without regard to prejudice arising from nonproduction).

According to the state, the nonproduction of the Epps tape was harmless because the defendant had, and made use of, the "verbatim" transcript of the tape and

other evidence to impeach Gray's testimony. It concedes that because the police deliberately destroyed the tape, the state must show that the defendant was not prejudiced. It asserts, however, that the appropriate standard is whether it is more likely than not that the nonproduction was harmless. See *United States* v. *Wallace,* 848 F.2d 1464, 1471 (9th Cir. 1988). The defendant claims, however, that if a per se sanction is inappropriate, then the state should be required to show harmlessness beyond a reasonable doubt. The claims raised by the parties therefore require our determination: (A) whether the conduct of the New Haven police shifted to the state the burden of showing harmlessness; (B) if so, whether the state must show harmlessness beyond a reasonable doubt or by a lesser standard; and (C) whether the state has met the applicable standard in the present case.

## A

In addressing claims that the trial court should have stricken testimony under Practice Book § 755, we have often observed that " '[s]ince access to the statements of witnesses for the prosecuting authority is not a constitutional right; *United States* v. *Augenblick,* 393 U.S. 348, 356, 89 S. Ct. 528, 21 L. Ed. 2d 537 (1969) . . . *State* v. *Pikul,* 150 Conn. 195, 202, 187 A.2d 442 (1962); the burden of showing prejudice rests on the defense. . . .' (Citations omitted.) *State* v. *Myers,* [supra, 469 n.7]; see [*Gonzales I,* supra, 436 n.8]; *State* v. *Cooper,* 182 Conn. 207, 212, 438 A.2d 418 (1980)." *State* v. *Milum,* supra, 616; see also *State* v. *Mullings,* supra, 8; *State* v. *Vessichio,* supra, 661–62; *Gonzales II,* supra, 119. In several of the decisions in which we stated this rule, the police had acted deliberately in destroying the discoverable material. See, e.g., *State* v. *Santangelo,* supra, 587, 589; *State* v. *Mullings,* supra, 6; *State* v. *Vessichio,* supra, 661; *State* v. *Milum,* supra, 616–17; *State* v. *Myers,* supra, 466. As noted above,

however, the state has conceded that the Appellate Court was correct in holding that, because the New Haven police department deliberately destroyed the Epps tape, the state should be required to show that the nonproduction of the tape was harmless.

In light of the state's concession, we have no reason to disturb the Appellate Court's conclusion. The Appellate Court supported its position by reference to *United States* v. *Bufalino,* supra, 449. See *State* v. *Williamson,* supra, 118–18A. The court in *Bufalino* held that "[w]here, as here, the destruction is deliberate, sanctions will normally follow . . . unless the Government can bear the heavy burden of demonstrating that no prejudice resulted to the defendant." *United States* v. *Bufalino,* supra. Second Circuit Court of Appeals decisions following *Bufalino* indicate that if the state is only "negligent" in the loss or destruction of discoverable material, the defendant bears the burden of showing prejudice. See *United States* v. *Sommer,* supra, 17; see also *State* v. *Brown,* 528 A.2d 1098, 1102 (R.I. 1987) (under Jencks type rule, if violation inadvertent, defense bears burden of proving prejudice). We have in the past found Jencks Act decisions of the Court of Appeals for the Second Circuit compatible with our evaluation of issues under Practice Book § 752 et seq. See *United States* v. *Bufalino,* supra; *United States* v. *Miranda,* 526 F.2d 1319 (2d Cir. 1975), cert. denied, 429 U.S. 821, 97 S. Ct. 69, 50 L. Ed. 2d 82 (1976); see, e.g., *State* v. *Shaw,* supra, 386 (adopting balancing test from *United States* v. *Miranda,* supra, 1324); *State* v. *Myers,* supra, 468 (relying on *Bufalino); State* v. *Vessichio,* supra, 661 (relying on *Bufalino and Miranda*). We therefore conclude, as did the Appellate Court, that the state in the present case properly bears the burden of establishing harmlessness.

## B

The Appellate Court stated that the state must meet a "heavy" burden to show that nonproduction of material discoverable under Practice Book § 752 was harmless. *State* v. *Williamson,* supra, 118A, quoting *United States* v. *Bufalino,* supra. The court did not precisely define this burden. We have indicated that the proper harmless error inquiry is whether the result of the trial may have been different had the state not violated the rule. *Gonzales II,* supra, 119; see also *United States* v. *Sommer,* supra, 117 (issue is whether nonproduction undermines confidence in the outcome). We have not, however, defined with particularity the appropriate standard applicable to that inquiry. The question before us, therefore, is whether a violation of § 752 may be found harmless if the state can show that it is more probable than not that the defendant was not prejudiced; see *United States* v. *Wallace,* supra; *United States* v. *Carrasco,* supra; or whether the state should be required to show that the nonproduction was harmless beyond a reasonable doubt.

In *Goldberg* v. *United States,* 425 U.S. 94, 111 n.21, 96 S. Ct. 1338, 47 L. Ed. 2d 603 (1976), the United States Supreme Court ruled that "[s]ince courts cannot 'speculate whether [Jencks material] could have been utilized effectively' at trial . . . the harmless-error doctrine must be strictly applied in Jencks Act cases." See *Clancy* v. *United States,* 365 U.S. 312, 316, 81 S. Ct. 645, 5 L. Ed. 2d 574 (1961); *Gonzales I,* supra, 435; see also *United States* v. *Peters,* 625 F.2d 366, 371 (10th Cir. 1980); *United States* v. *Knowles,* 594 F.2d 753, 755 (9th Cir. 1979); *United States* v. *Butts,* 535 F. Sup. 608, 613 (E.D. Pa. 1982); *United States* v. *Reyes,* 510 F. Sup. 150, 153 (D. Ariz. 1981) (purporting to apply strict harmless error analysis). In the wake of *Goldberg,* however, the federal courts have not settled on an appro-

priate harmless error standard. See *United States* v. *Wallace,* supra, 1471 (standard not clear); *Lovern* v. *United States,* 689 F. Sup. 569, 578 (E.D. Va. 1988) (proper test not easily discerned); compare *Krilich* v. *United States,* 502 F.2d 680, 682 (7th Cir. 1974), cert. denied, 420 U.S. 992, 95 S. Ct. 1429, 43 L. Ed. 2d 673 (1975) (to extent Jencks violation impairs defendant's ability to cross-examine, violation must be harmless beyond reasonable doubt), with *Lovern* v. *United States,* supra, 578–79 (test is whether it is perfectly clear there was no prejudice), and *United States* v. *Wallace,* supra (conviction affirmed if it is more likely than not that Jencks error harmless).

In general, because a Jencks violation is not of constitutional dimension; see *United States* v. *Augenblick,* supra, 356; *Palermo* v. *United States,* 360 U.S. 343, 345, 79 S. Ct. 1217, 3 L. Ed. 2d 1287 (1959); *State* v. *Myers,* supra, 469 n.7; the government is not required to establish harmlessness beyond a reasonable doubt. See *United States* v. *Wallace,* supra; *United States* v. *Carrasco,* supra; 2 C. Wright, supra, § 439, p. 615. This principle, however, is not absolute. As the court observed in *United States* v. *Augenblick,* supra, 356, "[i]t may be that in some situations, denial of production of a Jencks Act type of a statement might be a denial of a Sixth Amendment right." See also *Palermo* v. *United States,* supra, 362–63 (Brennan, J., concurring) ("it would be idle to say that the commands of the Constitution were not close to the surface of [*Jencks* v. *United States,* 353 U.S. 657, 77 S. Ct. 1007, 1 L. Ed. 2d 1103 (1957) (decision precipitating enactment of Jencks Act)]"). Thus, "the failure to provide material to which the defendant is entitled under the Jencks Act may adversely affect a defendant's ability to cross-examine government witnesses and thereby infringe upon his constitutional right of confrontation." *Krilich* v. *United States,* supra, 682; *United States* v. *Cleveland,*

507 F.2d 731, 740–41 (7th Cir. 1974) (nonproduction must be harmless beyond reasonable doubt); cf. *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *United States* v. *Bagley,* 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (prosecution constitutionally required to produce for defense exculpatory evidence material to guilt).

In *United States* v. *Wallace,* supra, 1471, the Court of Appeals for the Ninth Circuit addressed the difficulties engendered by the nonproduction of material that is not available for trial or appellate court perusal. Noting that the denial of a Jencks statement might also be a denial of sixth amendment rights, the court stated that "[w]here, as here, the appellant's conviction rests heavily on the credibility of a single accomplice . . . the unproduced Jencks material may well implicate confrontation clause or compulsory process issues." The court thereafter remanded the case to the District Court. It held that, if the government did not produce the material, a reversal of the conviction may be warranted. "Any statements in [the material] that might have impeached [the witness'] testimony might also have tipped the balance of persuasion in favor of [the defendants]." Id., 1472.

We have also recognized the distinct problems raised by the unavailability of discoverable statements. In *Gonzales I,* supra, 435, we held that, under Practice Book § 753,[4] it was error for the trial court to refuse

[4] "[Practice Book] Sec. 753.——DELIVERY AND EXCISION OF STATEMENTS
"If the entire contents of a statement requested under Sec. 752 relate to the subject matter of the testimony of the witness, the judicial authority shall order the statement to be delivered directly to the defendant or his counsel for his examination and use. If the prosecuting authority claims that any statement ordered to be produced·under Sec. 751 contains matter which does not relate to the subject matter of the testimony of the witness, the judicial authority shall order the prosecuting authority to deliver such statement for the inspection of the judicial authority in camera. Upon such delivery, the judicial authority shall not disclose that portion of such

to inspect in camera an allegedly discoverable statement. We stated that "[u]ntil the . . . statement is inspected by the [trial] court, the state's final argument [that the error was harmless] must . . . fail. Whether the defendant was prejudiced by not having access to the whole . . . statement cannot be determined by speculation about what that statement contains. Nor may we speculate as to whether the jury would have convicted the defendant had the . . . testimony been stricken if the state had elected to refuse to produce the statement."

That harmless error analysis should be "strictly applied" because the courts cannot realistically speculate on the defendant's possible use of unproduced material is especially compelling in the present case. *Goldberg* v. *United States,* supra; *United States* v. *Wallace,* supra; *Gonzales I,* supra. The New Haven police, acting as the state's agents, deliberately destroyed discoverable material after our repeated admonitions that such material must be preserved. In destroying this material, the state has precluded the courts as well as the defendant from assessing its significance. Cf. *Gonzales I,* supra (without statement, this court cannot determine whether there has been harmless error). This is not a case in which either the trial court or a reviewing court has access to the unproduced material. Cf. *Rosenberg* v. *United States,* supra, 371. Further, Gray

statement which does not relate to the subject matter of the testimony of the witness. With such material excised or obliterated, the judicial authority shall then direct delivery of such statement to the defendant or his counsel for his use. If, pursuant to this procedure, any portion of such statement is withheld from the defendant or his counsel and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be sealed and preserved as an exhibit in the case, and, in the event that the defendant appeals, it shall be made available to the appellate court and, unless for good cause the trial court orders otherwise, to counsel for the parties for the purpose of determining the correctness of the ruling of the judicial authority."

did not review the transcript of the Epps tape until the first day of trial, some seven months after she had made the statement. Thus, this is not a case in which the declarant read and adopted a counterpart transcript within a short time after making the statement. Cf. *State* v. *Santangelo,* supra, 589–90 (witness reviewed and signed transcript five days after making taped statement). Moreover, the defendant's conviction obviously rested on Gray's testimony. *United States* v. *Wallace,* supra, 1471–72. Under the facts of the present case, therefore, we would not be unwarranted in "strictly applying" the harmless error doctrine to require the state to prove harmlessness beyond a reasonable doubt. *Goldberg* v. *United States,* supra; *United States* v. *Wallace,* supra.

## C

Despite these serious concerns, however, we need not decide whether the state must prove harmlessness beyond a reasonable doubt under the circumstances present here. We are persuaded that the state has not demonstrated that it is more probable than not that nonproduction of the Epps tape was harmless. In applying the balancing test set forth in *State* v. *Shaw,* supra, we are again guided by the direction of the federal courts of the Second Circuit: "[T]he better course to follow is for the Court to make a 'case-by-case assessment of the [state's] culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the [state's] untainted proof.' [*United States* v. *Grammatikos,* 633 F.2d 1013, 1019–20 (2d Cir. 1980)]; see also *United States* v. *Bufalino,* [supra]; *United States* v. *Alfonso-Perez,* 535 F.2d 1362 (2d Cir. 1976); *United States* v. *Miranda,* [supra, 1327–28]." *United States* v. *Konefal,* 566 F. Sup. 698, 704 (N.D.N.Y. 1983); cf. *State* v. *Santangelo,* supra,

588 (when burden is on defendant, he must show
"realistic possibility of prejudice").

We have already discussed the state's culpability at
length. Turning to the question of prejudice, the rec-
ord discloses several critical inconsistencies between
Gray's trial testimony and prior statements, and
between the prior statements themselves. Gray testi-
fied at trial that the defendant grabbed her by the neck
from behind. According to the transcript of the Epps
recording, however, she told Epps that the defendant
had grabbed her by the coat from behind. She told
Rawling, the first officer to interview her, that the
defendant had walked up to her and had asked her for
money without first touching her. Gray also testified
at trial that the defendant exited the apartment build-
ing by slowly walking backward through the rear door,
and then ran across a field toward Canal Street. She
told Rawling, however, that the defendant had run out
the front door and down Ashmun Street. She also told
Epps that the defendant had walked ahead of her when
leaving the building. She testified, however, that she
did not recall telling this to Epps.

Further, Gray testified that the defendant replaced
the handgun in his gym bag as he walked backward
toward the door. According to the transcript of the
Epps tape, however, Gray told Epps that the defend-
ant had put the gun in the gym bag before he walked
away. At trial, she stated that she could not remem-
ber what she had told Epps regarding what the defend-
ant had done with the gun after the robbery. In
addition, the defendant used the Epps tape transcript
to establish that Gray had told Epps that the defend-
ant appeared to be under the influence of narcotics.
Rawling, however, testified that Gray did not make any
statement to him about whether the defendant
appeared under the influence. Moreover, at trial, she
testified that she saw the defendant after the incident

when she had returned home and had stood on the porch. According to the Epps transcript, however, she told Epps that, while walking home after the incident, she glanced over her shoulder and saw the defendant running toward Canal Street. She also testified that she did not remember telling Epps that she saw the defendant running toward Canal Street. The record further demonstrates several inconsistencies between Gray's testimony and a statement she had given Officer David Taft pertaining to a subsequent encounter with the defendant.

This is certainly not a case in which "[t]here is absolutely nothing in the record from which we can infer that the tape recorded statement might have contained any inconsistency." *State* v. *Myers*, supra, 469; *State* v. *Palmer*, supra, 59; *State* v. *Mullings*, supra, 10–11. As Gray's testimony demonstrates, there were several critical statements in the Epps transcript and Rawling's report that she did not recall making, or that she denied making. Further, we also find significant the fact that Gray did not review the transcript of the Epps tape until several months after the alleged robbery. See *State* v. *Santangelo*, supra, 589 (typed transcript signed five days after taped statement); *State* v. *Milum*, supra, 617–18 (typewritten copy reviewed and signed by witness shortly after taped statement). Further, the state has not challenged the Appellate Court's inference that the Epps tape "was the longest and presumably the most thorough description of the incident given outside the courtroom . . . ." *State* v. *Williamson*, supra, 118C; cf. *State* v. *Santangelo*, supra, 588 (reasonable to infer that brief, routine telephone call reporting missing person contained no significant details).

We have recognized that the availability of other impeachment sources, as well as the opportunity for full cross-examination of the witness, are factors to be considered in determining whether the defendant has

been prejudiced. *State* v. *Palmer,* supra, 60 (full cross-examination); *State* v. *Myers,* supra, 469 (numerous other sources of impeachment utilized); *State* v. *Shaw,* supra, 386–87 (second statement substantially same as lost statement; full opportunity to cross-examine witness; officer testifying on contents of witness' lost statement). We have not even remotely suggested, however, that those factors are determinative. Indeed, as the defendant argues, a conclusion that the defendant has not been prejudiced solely because defense counsel utilized other impeachment sources and was given wide latitude in cross-examination would penalize defendants for the best representation their counsel could provide with the available information.

The state has also suggested that we have not explained in our prior decisions why production of an audio tape is preferable to a "verbatim" transcript. See *State* v. *Mullings,* supra. The state argues that the only possible value of an audio tape is that it imparts to the listener the sound of the witness' voice. It claims that because it was Epps' voice and not Gray's on the tape recording, there is no good reason to prefer the tape to the transcript. The question, however, is not what we "prefer" but what the provisions of the Practice Book mandate. *Gonzales I,* supra, 432. The state has not claimed on certification that the Epps recording was not subject to discovery under § 752. Consequently, no explanation for our "preference" is necessary. Even if an explanation were necessary, however, we have already indicated the difficulties attendant to a trial or appellate court's speculation on the contents of nonexistent discoverable material. See *United States* v. *Wallace,* supra; *Gonzales I,* supra. We also note that the state inadvertently demonstrates the significance of original statements by stating at one point in its brief that Gray "never waivered on her claim that the defendant asked her for money, then pulled a *knife* from

his gym bag . . . . '' (Emphasis added.) If the state could overlook this typographical error before filing its brief, we find it peculiar for it to insist that the New Haven police department's stenographer prepared a "verbatim" copy of the Epps recording.[5] A "preference" for the original tape recording eliminates the need for speculation.

We therefore conclude that, upon the present record, the state has not demonstrated that it is unlikely that the nonproduction of the Epps tape recording did not affect the result of the case.[6] In reaching its conclusion that the defendant had not been prejudiced, the trial court observed that "[t]he ultimate decision here is with respect to the jury and it was amply pointed out by counsel . . . and in the evidence that the tape had been destroyed . . . . [I]t's up to the jury to decide whether they'll believe the witness or not. And all of these other tapes and other things are simply ancillary to the defendant being able to pinpoint other discrepencies. And in my judgment, this has been done adequately . . . . '' We have no quarrel with the principle that it is best to leave the question of a witness' credibility to the trier of fact. As the trial court's statements make clear, however, the jury's exposure to the fact that the Epps tape had existed but had been destroyed was critical to its conclusion that the defendant had suffered no prejudice. That the jury may have been aware that the tape had been erased, however, is irrelevant to the question whether the defendant has been prejudiced. The jury's speculation on the contents

---

[5] We note that the defendant repeated this error in his brief.

[6] The state suggests that because the trial court did not require the state to demonstrate harmlessness, a burden placed on it by the Appellate Court, we should remand the case for a hearing in which the state can present proof that the transcript was, in fact, "verbatim." The state does not indicate what evidence it would use to establish this. In any event, we decline to follow the state's suggestion.

of the unproduced material is not entitled to any weight. We therefore affirm the Appellate Court's implicit conclusion that the trial court abused its discretion in failing to strike Gray's testimony. *State* v. *Santangelo,* supra.

### III

The state has not argued or suggested that, if we reversed the Appellate Court's judgment only on the 911 tape issue, the prejudice resulting to the defendant from the destruction of the Epps tape alone would not require the sanction of striking Gray's testimony. We do not see how that could be the case. Consequently, we do not reach the issues pertaining to the 911 tape.

The judgment of the Appellate Court is affirmed.

In this opinion PETERS, C. J., CALLAHAN and HULL, Js., concurred.

SHEA, J., dissenting. The irritation expressed by the majority over the cavalier attitude shown by the New Haven police department toward our decisions relating to the preservation of the statements of witnesses is understandable, but it does not warrant reversal of the defendant's robbery conviction or the disregard of heretofore well established principles of harmless error analysis. Although there are some instances in which we are compelled to let the criminal "go free because the constable has blundered"; *People* v. *Defore,* 242 N.Y. 13, 21, 150 N.E. 585 (1926); such a result is not justified in this case. This outcome, nevertheless, flows inevitably from this decision, because it is plain that the striking of the complainant's testimony leaves the defendant's conviction without a sufficient evidentiary basis and necessitates his acquittal.

I agree with the majority's rejection in part I of the conclusion by the Appellate Court that the police acted

in "bad faith" in erasing the tape of the complainant's testimony after it had been transcribed. The testimony that the loss of the recording resulted from the failure to advise the stenographer of the new departmental policy of preserving the tape adequately supports the trial court's finding that its erasure was inadvertent rather than intentional.

In part II A the majority concludes that the state should bear the burden of showing harmlessness, apparently because "the state has conceded that the Appellate Court was correct in holding that, because the New Haven police department *deliberately destroyed* the Epps tape, the state should be required to show that the nonproduction of the tape was harmless." (Emphasis added.) Having concluded in part I that the destruction of the tape was inadvertent and had resulted from the failure to inform the stenographer of the new policy, the declaration in part II A that the tape was "deliberately destroyed" by the police is wholly inconsistent with part I. This court is not bound by the state's concession, especially when it is contrary to a conclusion reached by a trial court. *State* v. *Heinz,* 193 Conn. 612, 616, 480 A.2d 452 (1984). The majority, however, despite rejection of the "bad faith" conclusion of the Appellate Court, accepts its characterization of the destruction of the tapes as "deliberate," when the testimony is undisputed that it resulted from the failure to inform the stenographer to preserve the tape. As the opinion concedes, an inadvertent failure to preserve a statement discoverable under the Jencks Act leaves the burden of proving prejudice on the defendant.

As the majority recognizes, a Jencks Act violation is not a violation of a constitutional right. A failure to comply with Practice Book § 752 is of no greater import. The rule we have followed in respect to non-constitutional rights of an accused is that he bears the burden of proving prejudice by showing that the out-

come of the trial would probably have been different if the nonconstitutional infraction had not occurred. I see no reason to reverse the standard allocation of the burden of proving prejudice in this instance of a nonconstitutional deviation from the procedure we have prescribed for the preservation of the statement of a witness.

Even if the burden of disproving prejudice were properly to be imposed upon the state, the circumstances of this case demonstrate that the burden has been adequately sustained. The possibility that there is some significant discrepancy between the complainant's account of the robbery as recorded on the tape and the transcript thereof made by the stenographer is quite remote according to common experience. The complainant testified that the transcript was accurate. Although the opinion refers to inconsistencies between the testimony of the complainant at trial and statements she made to the police, including the transcript of her statement to officer Epps, none of these involve her identification of the defendant or her contention that he had robbed her. The defendant admitted that he had conversed with the complainant in the building where and at the time when the robbery was claimed to have occurred. His testimony was that the complainant, apparently so enamored of him that she sought to arrange a rendezvous with him at her sister's home, was so offended by his spurning her overture that she was avenging herself by seeking his arrest. That fanciful explanation of the complainant's motivation for prosecuting the defendant was rejected by the jury in finding him guilty. It is wholly speculative to assume, as the majority does, that some further inconsistency in the details of the complainant's account of the robbery would have lent sufficient credibility to the defendant's testimony to have raised a reasonable doubt in the minds of the jurors.

Accordingly, I dissent.