STATE OF CONNECTICUT v. CHRISTOFE P. BELLE
(13825)

PETERS, C. J., SHEA, CALLAHAN, GLASS, COVELLO, HULL and SANTANIELLO, Js.

Argued January 11 and May 1—decision released June 5, 1990

*Suzanne Zitser,* assistant public defender, with whom, on the brief were *G. Douglas Nash,* public defender, and *Thomas Ullmann,* assistant public defender, for the appellant (defendant).

*Judith Rossi,* assistant state's attorney, with whom, on the brief, was *Michael Dearington,* state's attorney, for the appellee (state).

HULL, J. The defendant, Christofe P. Belle, was charged in a substitute information with the crimes of sexual assault in the first degree in violation of General Statutes § 53a-70[1] and burglary in the second

---

[1] General Statutes (Rev. to 1987) § 53a-70 provides in pertinent part: "(a) A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

degree in violation of General Statutes § 53a-102.[2] After a jury trial, he was acquitted of the charged offenses, but was convicted of criminal trespass in the second degree; General Statutes § 53a-108;[3] a lesser included offense of burglary in the second degree. The trial court thereupon sentenced the defendant to an unconditional discharge. On appeal from this judgment, the defendant challenges: (1) the trial court's admission into evidence of the testimony of three state's witnesses whose statements had been destroyed by the investigating police department prior to the commencement of trial; and (2) the trial court's refusal to instruct the jury on the affirmative defense to criminal trespass in the second degree. We initially heard arguments in this case in January, 1990. Thereafter, we requested, sua sponte, further argument en banc. We now affirm the judgment of the trial court.

The jury could reasonably have found the following facts. During the summer of 1986, M and T, female students at Southern Connecticut State University (SCSU) in New Haven, were living on the fifth floor in Chase Hall, a residential dormitory on the SCSU campus. At approximately 6 p.m. on August 1, 1986, the two women left Chase Hall to walk to Skidder's, a nearby bar and dancing establishment. Upon discovering that Skidder's was not yet open for the evening, they decided to go first to Pizza Pal, where they shared a pizza and a pitcher of beer, and then to a bar, the New West Cafe.

While at the New West Cafe, M and T met three men, the defendant, Jacques and Fran. They spoke with the

---

[2] General Statutes § 53a-102 provides in pertinent part: "(a) A person is guilty of burglary in the second degree when he enters or remains unlawfully in a dwelling at night with intent to commit a crime therein."

[3] General Statutes § 53a-108 provides in pertinent part: "(a) A person is guilty of criminal trespass in the second degree when, knowing that he is not licensed or privileged to do so, he enters or remains in a building."

men and learned during their conversation that the men were originally from France but were presently living in Branford where they worked as pastry chefs. At approximately 10 p.m., M and T decided to walk to Skidder's and made informal arrangements to meet the three men there later.

M and T saw the three men thereafter at Skidder's and joined them for conversation and dancing. At approximately 11:30 p.m., M left Skidder's with Fran and took him to her room at Chase Hall dormitory. M used her key to obtain entry through the back door. Once in M's room, M and Fran removed their clothes and engaged in consensual sexual intercourse. They then returned to Skidder's at approximately midnight.

At some point during the course of the evening at Skidder's, T had a conversation with a college friend who had formerly lived in Chase Hall. They discussed the fact that, without a key, entry into Chase Hall could be achieved by scaling the building and climbing into the dormitory through an upper floor window. During this conversation, Jacques was standing behind T and overheard the discussion.

At closing time, approximately 2 a.m., M and T left Skidder's, having made no arrangements subsequently to meet the defendant, Fran and Jacques. When the women arrived at Chase Hall, they entered the back door of the locked dormitory with a key and went upstairs into the fifth floor lounge to eat sandwiches that they had just purchased. The women went to their respective rooms in the dormitory at approximately 2:30 a.m.

M went to bed wearing a tee shirt and underwear and left her door unlocked and ajar. M testified that she was a very deep sleeper, but that she was awakened at 4 a.m. by two men, one of whom she recognized as Fran and the other as the defendant, standing in her

room. She testified that first Fran and then the defendant proceeded to engage in sexual intercourse with her. According to M, she was "in and out of sleep" during the entire incident.

T testified that she was awakened at approximately 4 a.m. by several knocks on her door. Unlike M, T stated that she had locked the door to her room prior to getting into bed. When she heard the knocks, she got up and found Jacques standing at her door. He told her that he wanted to see her. When asked how he had gotten into the building, Jacques responded: "Through the window like you said." T became concerned when she learned that the defendant and Fran were in M's room, so she decided to check on M. Jacques followed T and eventually cut ahead of her. He then opened the closed door to M's room, said "Oops, sorry," closed the door, and then returned with T to T's room. T testified that she did not hear any yelling or screaming from M's room. When T got back into her room, Jacques made sexual advances that T refused.

T then saw a shadow in the bathroom adjoining her room. When T asked who it was and got no answer, she walked over to the bathroom and saw Fran standing there in his underwear. She started yelling at Fran and then ran to M's room. When T threw open M's door, the defendant, who was not clothed, was either on top of M or had just gotten off of her. T became extremely upset and yelled at Fran and the defendant. She subsequently escorted all three of the men down the elevator and out of the building.

T then returned to M's room and found M crying, standing by her closet. M told T that the men had hurt her and that she wanted T to call the police. T immediately called the SCSU police who arrived within five minutes. They interviewed M and T and then took them to Yale-New Haven Hospital where M was examined and released.

Officer Thomas Buell of the campus police conducted an examination of the exterior windows of Chase Hall and found an open window with no screen in the third floor lobby and also found a sneaker print on the windowsill. He testified that during the six years that he had been an officer at the university, it was "quite a common practice for students and nonstudents alike" to enter Chase Hall through the windows. Later in the morning of August 2, 1986, Detective Robert Coffey of the New Haven police department arrived at Chase Hall to begin the department's investigation into the alleged crimes.

Although the defendant did not testify at trial, a statement that he had given Coffey while he was being held in custody on unrelated charges was introduced at trial.[4] The defendant had admitted to Coffey that he had been in the dormitory on the SCSU campus on August 2, 1986, and that he thought his friend had engaged in sexual acts with a young woman in the dormitory. The defendant denied in his statement to Coffey, however, that he had engaged in any such activities with the woman. At trial, during cross-examination of M and during his closing argument, the defendant suggested that M had consented to any sexual activities that had occurred during the early morning hours of August 2, 1986.

I

The defendant first claims that the trial court should not have admitted into evidence the testimony of M, T and Coffey. The defendant's argument is based on the fact that the New Haven police destroyed statements of these witnesses prior to the commencement of trial. According to the defendant, the state's conse-

---

[4] Prior to the commencement of trial, the defendant moved to suppress this statement. The trial court denied the defendant's motion, a ruling that is not an issue in this appeal.

quent failure to produce the statements pursuant to General Statutes § 54-86b[5] and Practice Book § 752 et seq.[6] so prejudiced him that the court's refusal to strike the trial testimony of the three witnesses requires reversal of his conviction. We do not agree.

The following facts are relevant to the defendant's claim. On the morning of August 2, 1986, M and T were interviewed by Coffey. During the course of these interviews, the detective took notes on the back of an "8-1/2 by 11 scrap paper folded into quarters." He later incor-

[5] "[General Statutes] Sec. 54-86b. RIGHT OF ACCUSED TO EXAMINE STATEMENTS. (a) In any criminal prosecution, after a witness called by the prosecution has testified on direct examination, the court shall on motion of the defendant order the prosecution to produce any statement oral or written of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified, and the court shall order said statement to be delivered directly to the defendant for his examination and use.

"(b) If the prosecution fails to comply with the order of the court, the court shall strike from the record the testimony of the witness and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

[6] "[Practice Book] Sec. 752.—— ——PRODUCTION FOLLOWING TESTIMONY

"After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

"[Practice Book] Sec. 755.—— ——FAILURE TO COMPLY WITH ORDER

"If the prosecuting authority elects not to comply with an order of the judicial authority to deliver to the defendant any statement of a witness who has testified or such portion thereof as the judicial authority may direct, the judicial authority shall strike from the record the testimony of the witness, and the trial shall proceed unless the judicial authority, in his discretion, upon motion of the defendant, determines that the interests of justice require that a mistrial be declared."

Practice Book § 749 defines "statement" as "(1) A written statement made by a person and signed or otherwise adopted or approved by him; or

"(2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement."

porated the information from these notes into his police report and discarded the paper containing the written notes.

On August 4 and 9, 1986, Coffey took tape recorded statements from T and M, respectively. Five days after T gave her statement, she reviewed a transcription of that statement, made minor changes in the transcription and then signed it. M reviewed and signed, without making changes, a transcription of her tape recorded statement three days after she had given the statement. In both instances the tapes were erased subsequent to their transcription pursuant to a routine police procedure of erasing and reusing such tapes.

On June 6, 1987, the defendant was arraigned in New Haven on unrelated charges. Coffey had called M to ask her to come to the court house to see if she could identify the defendant as her assailant. M identified the defendant as one of the men who allegedly had sexually assaulted her on August 2, 1986. Subsequent to making the identification, M gave a tape recorded statement to Coffey regarding the identification procedure. The tape was transcribed and was then erased. M did not review this latter transcription until the pretrial hearing one year later when she adopted it as her own.

Because the destruction of the detective's notes and of M's and T's tape recorded statements would render impossible the state's compliance with General Statutes § 54-86b and Practice Book § 752 et seq., the defendant filed a pretrial motion requesting that the court exclude at trial the testimony of M, T and Coffey. A hearing on this motion was held prior to the commencement of trial, during which testimony was heard from M, T, Coffey and another police officer involved in the investigation of the crimes with which the defendant was charged. The testimony elicited at the pretrial hearing concerned the events of August 1 and 2, 1986,

as well as the making and destruction of Coffey's notes and M's and T's tape recorded statements.

After hearing the testimony, the trial court ruled on the admissibility of the witnesses' testimony at trial.[7] The court determined that Coffey's field notes were not "statements" under Practice Book § 749, and thus were not subject to disclosure pursuant to Practice Book § 752. The court determined that the tapes, however, were subject to disclosure, and that they had been intentionally destroyed by the police.[8] Accordingly, the court shifted the burden to the state to establish that the defendant had not been prejudiced by the destruction and absence of the tape recorded statements. The court then concluded that the state had met its burden of proof by establishing by a fair preponderance of the evidence that the defendant had not been prejudiced by the erasures. As a result of the trial court's ruling on the defendant's motion to exclude, the state called M, T and Coffey to testify at trial.

[7] At the time the trial court made its ruling, the most recent decision concerning police destruction of witnesses' statements was *State* v. *Williamson,* 14 Conn. App. 108, 552 A.2d 815 (1988). The trial court thus relied on this decision in making its ruling. During the pendency of the defendant's appeal, we heard on certification the appeal from the Appellate Court's decision in *Williamson; State* v. *Williamson,* 212 Conn. 6, 562 A.2d 470 (1989); and also considered an identical claim in *State* v. *Johnson,* 214 Conn. 161, 571 A.2d 79 (1990). These two cases provide the foundation for our analysis of the defendant's claims of error with respect to the destruction of the witnesses' statements.

[8] The trial court characterized the conduct of the New Haven police as "bad faith" in reliance on the definition given that term by the Appellate Court in *State* v. *Williamson,* 14 Conn. App. 108, 117, 552 A.2d 815 (1988). We have altered, however, the Appellate Court's definition of "bad faith" in the context of General Statutes § 54-86b and Practice Book § 752 violations: "In the context of a § 752 violation . . . the term 'bad faith' connotes a deliberate act done with intent to deprive the defense of information." *State* v. *Williamson,* 212 Conn. 6, 16, 562 A.2d 470 (1989). In the present case, the trial court specifically found that the erasure of the tapes was not "intentional malicious bad faith directed at this defendant in any way." Thus, the erasure was not done in "bad faith" as we have defined that term.

The defendant challenges three aspects of the court's ruling concerning the admissibility of the testimony of these three witnesses: (A) the trial court's determination that Coffey's field notes were not subject to disclosure pursuant to Practice Book § 752; (B) the trial court's application of the more probable than not standard to the harmless error inquiry; and (C) the trial court's conclusion that the state had satisfied its burden of showing the harmlessness of its failure to produce the notes and tapes.

A

We turn first to the question of whether Coffey's field notes were subject to disclosure under Practice Book § 752. " 'Under some circumstances, [Practice Book] § 752 authorizes a defendant to obtain for the purpose of cross-examining a witness the officer's record of an interview.' *State* v. *Anonymous (83-FG)*, 190 Conn. 715, 734, 463 A.2d 533 (1983). 'Practice Book § 749 limits the disclosures governed by §§ 748 through 755 to two categories of materials: "(1) A written statement made by a person and signed or otherwise adopted or approved by him; or (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." ' *State* v. *Myers,* 193 Conn. 457, 470, 479 A.2d 199 (1984). '[A] police officer's interview notes may be subject to disclosure for use by the defendant in cross-examining the witness, if the officer's notes meet either of § 749's alternate definitions of a statement. The notes may also be discoverable following the officer's own testimony if they are "signed or otherwise adopted." ' Id.; *State* v. *Anonymous (83-FG)*, supra." *State* v. *Hinton,* 196 Conn. 289, 299–300, 493 A.2d 836 (1985).

The defendant contends that Coffey's testimony during the pretrial hearing revealed that his notes were "statements" as defined by our rules of practice. We do not agree. First, the record does not indicate that the notes were "statements" of M and/or T. Coffey testified that during his initial interviews with M and T, he did take notes. He testified further, however, that he had not recorded M's and T's words verbatim and that he had not shown those notes to M and/or T to be signed or otherwise adopted by them. See *State* v. *Myers,* supra, 471. Second, the notes were not Coffey's "statements." Coffey testified that, during the initial interviews, he had written "[o]ccasional reminders" to himself on an "8-1/2 by 11 scrap paper folded into quarters" and that he had discarded the notes after writing his report.[9] The notes were not signed and the record does not indicate that they were "otherwise adopted." See id.; *State* v. *Anonymous (83-FG),* supra, 734. Accordingly, the trial court correctly ruled that Coffey's notes were not subject to disclosure pursuant to Practice Book § 752.

B

There is no question that the tapes were "statements" of M and T and were thus subject to the applicable disclosure provisions. Practice Book § 749 (2). Due to the police destruction of these tapes, however, the state was unable at trial to comply with the mandates of General Statutes § 54-86b and Practice Book § 752 et seq.[10] We have recently set forth the analysis

---

[9] Prior to the commencement of trial, the defendant was provided copies of relevant police reports.

[10] The defendant did not renew his motion to strike after the testimony of T, M and Coffey. We recently refused to review claims of error with respect to destroyed statements due to such a failure to renew motions to strike. *State* v. *Johnson,* 214 Conn. 161, 169–71, 571 A.2d 79 (1990). In *Johnson,* the defendant presented no testimony at the pretrial hearing concerning the expected substance of the various witnesses' trial testimony. Furthermore, the trial court specifically stated that its ruling on the admis-

to be applied in such cases. "[I]f a case involves intentional, but not bad faith, destruction of the statement of a state's witness, an automatic sanction of striking that witness' testimony is not required. [*State* v. *Williamson,* 212 Conn. 6, 15–16, 562 A.2d 470 (1989)]." *State* v. *Johnson,* 214 Conn. 161, 168, 571 A.2d 79 (1990). Rather, under such circumstances, "it is appropriate that the court weigh ' "the culpability of the state for its failure to make disclosable material available on the one hand, against any resulting prejudice to the defendant on the other. *State* v. *Myers,* [supra, 469]; *State* v. *Shaw,* [185 Conn. 372, 386, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982)]." *State* v. *Santangelo,* [205 Conn. 578, 587–88, 534 A.2d 1175 (1987)]; *State* v. *Mullings,* [202 Conn. 1, 10, 519 A.2d 58 (1987)].' *State* v. *Williamson,* supra, 14. This approach gives broad discretion to the trial court. Id. Where . . . the destruction of a witness' statement, although not in bad faith, is deliberate, the state properly bears the burden of establishing harmlessness. Id., 18. '[T]he proper harmless error inquiry is whether the result of the trial may have been different had the state not violated the rule.' Id., 19." *State* v. *Johnson,* supra, 172.[11]

sibility of the trial testimony of the witnesses whose taped statements had been destroyed was preliminary and encouraged the defendant to renew his motion to strike after the testimony of each of the witnesses. We determined that the defendant had failed to preserve his claims of error by not renewing his motions to strike. Id. The present case is clearly distinguishable. At the pretrial hearing, the trial court heard testimony concerning the events of March 1 and 2, 1986, in addition to the procedural aspects of the making and destruction of the tapes. The trial court ruled on the admissibility of the testimony at trial and gave no indication that the ruling was preliminary in nature. Thus, the defendant adequately preserved his claim of error for appeal. See Practice Book § 4185.

[11] The reargument in this case focused on the question of whether the state properly bears the burden of proof when the intentional, nonmalicious destruction of discoverable statements does not rise to the level of a constitutional violation. We answered that question in the affirmative in *State* v. *Johnson,* 214 Conn. 161, 172, 571 A.2d 79 (1990), and *State* v.

The appropriate standard to be applied to that harmless error inquiry depends upon the particular circumstances of the case. See id., 173–75; *State* v. *Williamson,* supra, 22–23. The trial court in the present case determined that the state need only prove that it was more probable than not that the defendant was not prejudiced by the nonproduction of the tape recorded statements. The defendant contends that the trial court should have required the state to prove harmlessness beyond a reasonable doubt. The basis of the defendant's claim is his contention that his opportunity to impeach M and T was so impaired by the nonproduction of their pretrial statements that his constitutional right to confront the witnesses against him was violated. We are not persuaded that, under the facts here presented, the defendant suffered a constitutional violation as a result of the state's failure to produce the tape recorded statements.

We have recognized that, under certain circumstances, the state's failure to produce material to which the defendant is entitled under General Statutes § 54-86b and Practice Book § 752 may adversely affect a defendant's ability to cross-examine a state's witness and thereby infringe upon his constitutional right of confrontation. *State* v. *Johnson,* supra, 173–74. In such a case, a court would be warranted in strictly applying the harmless error doctrine to require the state to prove harmlessness beyond a reasonable doubt. Id.; *State* v. *Williamson,* supra. In determining the effect of the state's nonproduction on a defendant's opportunity to cross-examine, we have considered such fac-

*Williamson,* 212 Conn. 6, 18, 562 A.2d 470 (1989), and adhere today to those decisions. The destruction or preservation of investigatory tapes is totally within the state's control. If the state deliberately destroys those tapes in direct violation of the rule of law as established by statute, our rules of practice and this court, we are of the view that requiring the state then to prove the harmlessness of its act is not an unwarranted consequence.

tors as the trial or reviewing court's access to the unproduced material, the declarant's adoption of a counterpart transcript within a short time after making the statement, and the extent to which the defendant's conviction rested on the testimony of the witness whose pretrial statement had been destroyed. See *State* v. *Johnson,* supra, 174–75 (the fact that the witness reviewed and signed within three days a typed transcription of his statement and the fact that the defendant's conviction did not rest solely on the testimony of that witness were major factors in applying the more probable than not standard to the harmless error inquiry); *State* v. *Williamson,* supra (the fact that the victim-witness did not review the transcription of her most detailed statement for seven months and the fact that the defendant's conviction rested solely on the testimony of the victim-witness were major factors in determining that the stricter standard of proof would not have been unwarranted).

In the present case, T reviewed and signed the typed transcription of her tape recorded statement within five days of having given the statement. Likewise, M reviewed and signed within three days the transcription of the first tape recorded statement that she had given. Although M did not review the transcription of her second statement until the day of the hearing, more than one year after having made the statement, the defendant's confrontation rights were not adversely affected by the lapse in time. The content of M's second statement was limited to the procedure by which M had identified the defendant as her alleged assailant. Since the defendant's identity was not an issue at trial, cross-examination concerning M's second statement was of little value to the defendant. Furthermore, in the present case, the defendant was found guilty of criminal trespass in the second degree, a conviction that did not rest solely on the testimony of T, or M, or a

combination of the two. The defendant admitted to having been in Chase Hall on August 2, 1986. The mode of entry used by the defendant and the other two men was confirmed by an SCSU police officer who found an open third floor window and a sneaker print on the nearby ledge. Under these circumstances, we conclude that the state's failure to produce the tape recorded statements of M and T did not rise to the level of a denial of the defendant's right of confrontation. Accordingly, the trial court properly determined that in order to meet its burden the state need only prove that it was more probable than not that the state's nonproduction of the statements was harmless.

## C

The defendant next claims that the trial court erroneously determined that the state had met its burden of proving harmlessness. In applying the balancing test set forth previously, we must weigh the state's culpability in the destruction of the tape recorded statements against the prejudice suffered by the defendant as a result of that destruction to determine whether the trial court abused its broad discretion in denying the defendant's motions to strike. *State* v. *Johnson,* supra, 175; *State* v. *Williamson,* supra, 16. We conclude that the trial court did not abuse its discretion.

As stated previously, the New Haven police deliberately destroyed the tape recorded statements of M and T pursuant to a routine department procedure of erasing and reusing such tapes. Turning to the question of prejudice, we note that the defendant had access to numerous other sources for use during his cross-examination of M and T. "Where there are critical inconsistencies between trial testimony and prior statements, and between the prior statements themselves, a defendant may be prejudiced by the absence of the tape recording. See *State* v. *Williamson,* supra, 24–25.

Where all indications are, however, that the witness has given consistent statements, we have been reluctant to find that the defendant suffered prejudice." *State* v. *Johnson,* supra, 175–76. We first note that upon review of the transcription of T's statement, her testimony at the pretrial hearing, and her testimony at trial, we find no inconsistencies. The defendant argued at trial and argues on appeal that the same consistency cannot be found in the various accounts of the incident given by M. While we do not disagree that M may have given inconsistent statements regarding the alleged crimes, we find that those inconsistencies concerned only the details of the events that allegedly had occurred in her dormitory room at 4 a.m. on August 2, 1986. Those inconsistencies provided the defendant with impeachment material with respect to the charged crimes of sexual assault and burglary, and undoubtedly contributed to the defendant's acquittal on those charges. The inconsistencies referred to by the defendant do not apply specifically to the crime of criminal trespass. The credibility of M's testimony with respect to that crime, as affected by her inconsistent versions of what had occurred in her dormitory room, was for the jury to determine. See *State* v. *McKnight,* 191 Conn. 564, 571–72, 469 A.2d 397 (1983).

We also find significant on the issue of prejudice the fact that both T and M reviewed and adopted the transcriptions of the relevant tape recorded statements within a short time after they had given the statements. See *State* v. *Johnson,* supra, 176; *State* v. *Santangelo,* supra, 589; *State* v. *Milum,* 197 Conn. 602, 617–18, 500 A.2d 555 (1985); cf. *State* v. *Williamson,* supra, 25 (fact that transcript of tape was not reviewed by witness-victim until several months after the alleged crime was significant factor in determining that state had not proven harmlessness of nondisclosure). Given the above-cited considerations, we conclude that the trial

court did not abuse its broad discretion in refusing to strike the trial testimony of M and T.

## II

The defendant also challenges the trial court's refusal to instruct the jury, as requested, on the affirmative defense to criminal trespass set forth in General Statutes § 53a-110: "It shall be an affirmative defense to prosecution for criminal trespass that . . . (3) the actor reasonably believed that the owner of the premises, or a person empowered to license access thereto, would have licensed him to enter or remain, or that he was licensed to do so." The defendant contends that sufficient evidence was adduced at trial to require a jury instruction on this affirmative defense. We do not agree.

"We have said that '[a] fundamental element of due process is the right of a defendant charged with a crime to establish a defense. *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *Bethea,* 167 Conn. 80, 83, 355 A.2d 6 (1974).' " *State* v. *Corchado,* 188 Conn. 653, 660, 453 A.2d 427 (1982), quoting *State* v. *Miller,* 186 Conn. 654, 660–61, 443 A.2d 906 (1982). Reasonable belief of license to enter a premises is a recognized affirmative defense to criminal trespass in the second degree. General Statutes § 53a-110 (3). An instruction on this theory of defense is required, as a matter of law, however, only when "the evidence indicates the availability of that defense." *State* v. *Fuller,* 199 Conn. 273, 278, 506 A.2d 556 (1986); see also *State* v. *Harris,* 189 Conn. 268, 274, 455 A.2d 342 (1983); *State* v. *Rosado,* 178 Conn. 704, 707–708, 425 A.2d 108 (1979). The evidence presented at trial must be viewed in the light most favorable to supporting the defendant's request to charge. *State* v. *Fuller,* supra, 279.

The defendant highlights the following testimony with respect to his claim that he was entitled to an instruction on the affirmative defense to criminal trespass in the second degree.[12] The testimony of M and T revealed that on the night of August 1, 1986, they had spent approximately five hours in the company of the defendant, Fran and Jacques. M testified that, during that time, she had taken Fran to her dormitory room where they had engaged in consensual sexual activities. T testified that at Skidder's she had discussed with a friend the fact that one could enter Chase Hall after hours by climbing onto the ledges and through the windows at the back of the building. A campus police officer confirmed at trial that this mode of entry was "frequently used" by both students and nonstudents. M also testified that she had left her door unlocked and ajar when she had gone to bed at 2:30 a.m. on August 2, 1986. Finally, T testified that upon questioning Jacques as to how he had entered the dormitory at 4 a.m. that same morning, he had responded: "Through the window like you said." The defendant argues that from this evidence, the jury could have inferred that M and/or T had arranged for the three men to enter Chase Hall during the early morning hours of August 2, 1986, for the purpose of engaging in consensual sexual activity. Accordingly, the defendant argues, the jury could have found that the defendant reasonably believed that he was licensed to enter Chase Hall.

The testimony elicited from the state's witnesses does not support the conclusion urged by the defendant. M and T specifically testified that they had not arranged to have the men enter Chase Hall during the early

---

[12] The defendant did not present at trial his own evidence or witnesses, but rather chose to put the state to its burden of proof on the charged and lesser included offenses. The defendant claims, however, that the evidence essential to support his affirmative defense to the crime of criminal trespass in the second degree was presented through the state's witnesses.

morning hours of August 2, 1986. Without resorting to speculation, we cannot interpret the evidence of M's and T's time spent in public with the three men, M's consensual sexual activity with one of the men, and M's unlocked door in an otherwise *locked* dormitory as evidence that the defendant and/or his friends were licensed to enter Chase Hall. Jacques' comment to T appears on its face to support the defendant's claim; however, when viewed in its proper context, it does not evidence the license or invitation the defendant would have us believe. T's testimony revealed that Jacques had heard mention of the window entry into the dormitory by eavesdropping on a conversation between T and her friend. We have said that " 'a defendant is "entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible . . . . " *United States* v. *Platt,* 435 F.2d 789, 792 (2d Cir. 1970), quoting *United States* v. *O'Connor,* 237 F.2d 466, 474 n.8 (2d Cir. 1956).' *United States* v. *Alfonso-Perez,* 535 F.2d 1362, 1365 (2d Cir. 1976)." *State* v. *Fuller,* supra, 278. In the present case, however, *no* testimony was presented from which the jury could have concluded, *without resorting to speculation,* that the defendant reasonably believed he was licensed to enter Chase Hall. In light of the inadequate factual basis asserted by the defendant, the trial court properly refused to charge on the affirmative defense to criminal trespass.

The judgment is affirmed.

In this opinion PETERS, C. J., GLASS and SANTANIELLO, Js., concurred.

SHEA, J., with whom CALLAHAN and COVELLO, Js., join, concurring. Although I agree with the remainder of the majority opinion, as well as the conclusion reached upholding the defendant's conviction, I disagree with Part I B, which imposes on the state the

burden of proving that the erasure of the tape recordings of the witnesses' statements was probably harmless. I continue to believe that, in this instance of an intentional but not malicious destruction of evidence,[1] as in other instances of prosecutorial failure to disclose evidence that may be exculpatory, the defendant should bear the burden of proving harmfulness by showing that the outcome of the trial would probably have been different if the missing evidence had been made available. *Arizona* v. *Youngblood,* 488 U.S. 51, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281 (1988), reh. denied, 488 U.S. 1051, 109 S. Ct. 885, 102 L. Ed. 2d 1007 (1989); *United States* v. *Bagley,* 473 U.S. 667, 681–82, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *State* v. *Johnson,* 214 Conn. 161, 180–81, 571 A.2d 79 (1990) (*Shea, J.,* concurring); *State* v. *Williamson,* 212 Conn. 6, 29–30, 562 A.2d 470 (1989) (*Shea, J.,* dissenting).

The failure of the police to preserve the tape recordings in this case violated no constitutional right of the

---

[1] The majority opinion characterizes the destruction of the tape recordings of the witnesses' statements as "deliberate" several times and refers in footnote 11 to a situation in which "the state deliberately destroys those tapes in direct violation of the rule of law as established by statute, our rules of practice and this court . . . . " The only evidence concerning the circumstances under which the tape recordings were destroyed was furnished by Detective Robert Coffey, who testified that at the time of their destruction in 1986 the New Haven police department had no firm policy regarding the preservation of tapes, but that it was customary to erase them for reuse after they had been transcribed, except in "major" cases, an undefined category. It was not until April, 1988, that he became aware of a departmental policy to preserve all recordings of witnesses' statements. Although it is undisputed that Coffey intentionally erased the tapes in order to make them available for reuse, there is no evidence that his actions were "characterized by or resulting from unhurried, careful, thorough and cool calculation *and consideration of effects and consequences,*" as the word "deliberate" implies. (Emphasis added.) Webster's Third New International Dictionary. The defendant does not claim that Coffey was aware of the rule of law established by our decision in *State* v. *Milum,* 197 Conn. 602, 615–18, 500 A.2d 555 (1985), requiring preservation of a tape recording after it has been transcribed.

defendant because the duty to disclose the prior statements of the witnesses for the state is based wholly upon General Statutes § 54-86b and Practice Book § 752. There is no reason to allocate the burden of proving prejudice for this nondisclosure of possibly significant evidence in a manner different from that in other instances of failure by the state to disclose relevant evidence, when no constitutional right is transgressed.

I concur in the judgment.