STATE OF CONNECTICUT *v.* ANTOINE REDDICK
(13335)

DUPONT, C. J., and FOTI and SCHALLER, Js.

Argued November 2, 1994—decision released February 7, 1995

*John W. Steinmetz,* with whom, on the brief, were *Thomas P. Orfanos* and *Linda L. Morkan,* for the appellant (defendant).

*Mary H. Lesser,* assistant state's attorney, with whom, on the brief were *Michael Dearington,* state's attorney, and *Elpedio Vitale,* assistant state's attorney, for the appellee (state).

FOTI, J. The defendant appeals[1] from the judgment of conviction, rendered after a jury trial, of two counts of burglary in the first degree in violation of General Statutes §§ 53a-8 and 53a-101 (a) (2), burglary in the second degree in violation of General Statutes § 53a-102 (a), two counts of robbery in the second degree in violation of General Statutes §§ 53a-8 and 53a-135 (a) (1), conspiracy to commit burglary in the second degree in violation of General Statutes §§ 53a-48 and 53a-102 (a), two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B), conspiracy to commit kidnapping in the first degree in violation of General Statutes §§ 53a-48 and 53a-92 (a) (2) (B), larceny in the first degree in violation of General Statutes § 53a-122 (a) (2), and conspiracy to commit larceny in the first degree in violation of General Statutes §§ 53a-48 and 53a-122 (a) (2). The defendant was sentenced to a total effective sentence of fifty years incarceration. The defendant claims that the trial court improperly (1) failed to strike the testimony of two

---

[1] Pursuant to Practice Book § 4023, the Supreme Court transferred the appeal to this court.

state's witnesses, (2) allowed testimony under the hearsay exceptions for express admissions and adoptive admissions, (3) allowed evidence of consciousness of guilt, and (4) allowed the admission of documents under the catchall exception to the hearsay rule. We affirm the judgment of conviction.

The jury could reasonably have found the following facts. On July 15, 1982, at approximately 1:30 a.m., two men entered the house of Edward DiLauro and Henrietta DiLauro at 855 Prospect Street in Hamden. Henrietta DiLauro, a seventy-three year old woman, was asleep on the couch on the first floor. One of the men placed his hand over her mouth and she was lifted from the couch and carried into the bathroom. The men threatened to kill her if she screamed. Her mouth was stuffed with tissues and she was bound and put under the sink. They took her three rings and stated that they came from Harlem and needed money for drugs. They wore masks and gloves. She could not tell their race. From the bathroom she could see them carrying her belongings from the house to the garage, including a television from the master bedroom, two oriental rugs from the foyer and liquor from a cabinet. They packed her car, took the car keys, but had trouble starting the car.

After she was able to free herself, she went upstairs where she found her husband with a bloodied pillow over his face.[2] His hands were tied with an electric cord. He told her that two men had entered the bedroom while he slept, grabbed him, punched him in the nose, put the pillow over his face and tied his hands.

The police were called and Hamden police detective Andy Polzella responded at approximately 3:30 a.m. Shortly thereafter, Officer Ronald Durkin arrived to assist in the investigation. They spoke to the victims

---

[2] Edward DiLauro died prior to trial.

and examined the premises. The interior of the house was in disarray. The burglars' point of entry was found to be a rear bathroom window that had been pryed open with a tool. Outside, by this window, Durkin discovered a Greyhound bus route map, and a Jamaica, New York, bankbook in the name of James Dawson. The map was marked with the name Maxine Dawson and with a destination. The two items were later sent to the Federal Bureau of Investigation for purposes of fingerprint comparison. A search for latent fingerprints within the house proved negative.

Later that morning, Henrietta DiLauro gave a statement at police headquarters. She could not identify the robbers or determine their race. She gave a list of the items stolen from the house and her person, which included a bankbook from the Connecticut Savings Bank.

Later on that same day, July 15, 1982, a woman entered the Connecticut Savings Bank with the DiLauro bankbook and approached the teller, Terry Gambardella. The woman sought to withdraw money from that account but since the bank signature card did not match the woman's identification, the woman was asked to wait while Gambardella consulted the head teller. The woman departed, leaving a credit card and the bankbook. Later, Gambardella identified a police photograph of Carol Varella as the person attempting to withdraw money from the DiLauro account.

Varella's testimony estabished that on July 15, 1982, she was living in New Haven with Diane Reddick, the defendant's sister, and Kenny Sanders. At approximately 8:30 a.m., Varella was awakened by Sanders and the defendant. Sanders had a bankbook and a Visa credit card. He told Varella that he and the defendant had obtained them earlier, and he asked her to use the

bankbook to withdraw money for him. He convinced her that she could pass as a white person, which was the race of the DiLauros. She, along with the defendant and Sanders, went to the bank. She entered the bank, with Sanders following. When asked to wait by the teller, she and Sanders left. After returning to the car, she asked about the source of the bankbook. They told her that they had broken into a house on Prospect Street in Hamden, that Sanders climbed in a window and opened the front door for the defendant. They said they tied and gagged an old lady who had been asleep on the couch, and Sanders had punched an old man in the face and gagged him. Both Sanders and the defendant laughed about the crime. They related that they had tried to take bottles of liquor, television sets and oriental rugs but they had put it all in a car that they could not start. They said that they wore ski masks and pretended to be from New York. Although Varella could not recall which of the two men made each of the statements, both men participated in the conversation and neither disagreed with or disavowed what the other said. She also observed some jewelry, including a diamond ring and gold rings. At some point, she found some costume jewelry from the robbery in the trash in back of her house and she took some of it.

On July 23, 1982, the police seized the "junk" jewelry and Varella was arrested. She saw the defendant once after July 15, 1982. They spoke of the police investigation of the incident and the defendant said he would not let the police catch him. At the time of trial in 1992, she had not seen the defendant for ten years.

Arrest warrants were issued for the defendant and Sanders, and the police attempted to locate the defendant at his address in July, 1982. Several stakeouts at this and other locations proved unsuccessful. The

defendant was not located in 1982 or 1983. In 1984, police learned that the defendant had been located in Florida.

The defendant's fingerprints were found on the Jamaica bankbook and on the Greyhound map found at the scene of the crime. The defendant's fingerprints also matched those on a fingerprint card issued to James Dawson at the Chicago police department. An inspector from the state's attorney's office, Raymond Brodeur, contacted Sergeant Thomas Barnes, records supervisor of the Chicago police department. Barnes sent a sworn affidavit along with certified copies of the fingerprint card and a mug shot of James Dawson.

I

The defendant first claims that the trial court improperly failed to strike the testimony, pursuant to Practice Book § 752,[3] of two witnesses, Varella and Henrietta DiLauro. The defendant's argument is based on the allegation that the investigating police destroyed statements of these witnesses prior to the commencement of trial. According to the defendant, the state's consequential failure to produce the statements pursuant to Practice Book § 752 so prejudiced him that the court's refusal to strike the trial testimony of the two witnesses requires a reversal of his conviction. We do not agree.

The defendant's claims regarding each of the two witnesses will be addressed separately.

A

The following facts are relevant to the defendant's claim regarding Varella. Following Varella's direct tes-

---

[3] Practice Book § 752 provides: "After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness testified."

timony, the defendant was supplied with a typewritten copy of Varella's statement. During voir dire, Varella indicated that a tape had been made of her statement on the day of her arrest. Thereafter, that statement was typed, and she read and signed it. The tape could not be produced at trial and was presumed destroyed. The defendant's motion to strike Varella's testimony was denied by the trial court.

The defendant claims that the state's failure to produce Varella's taped statement infringed on his constitutional right of confrontation. He further claims that the state failed to prove that the nonproduction of the statement was harmless.

Our Supreme Court has set forth the analysis to be applied where the state is unable to comply with the mandate of Practice Book § 752. "[I]f a case involves intentional, but not bad faith, destruction of the statement of a state's witness, an automatic sanction of striking that witness' testimony is not required.[4] . . . Rather, under such circumstances, it is appropriate that the court weigh the culpability of the state for its failure to make disclosable material available on the one hand, against any resulting prejudice to the defendant on the other. . . . This approach gives broad discretion to the trial court. . . . Where . . . the destruction of a witness' statement, although not in bad faith, is deliberate, the state properly bears the burden of establishing harmlessness. . . . [T]he proper harmless error inquiry is whether the result of the trial may have been different had the state not violated the rule."

---

[4] In the context of this issue, bad faith is defined as destruction done with a deliberate intent to deprive the defendant of discoverable material or with malicious intent. *State* v. *Williamson*, 212 Conn. 6, 16, 562 A.2d 470 (1989). Here, the defendant concedes that there was no bad faith on the part of the police. He claims that nonproduction of the witness' statement violated his confrontation rights.

(Citations omitted; internal quotation marks omitted.) *State* v. *Belle*, 215 Conn. 257, 268, 576 A.2d 139 (1990).

The state's failure to provide material to which a defendant is entitled under Practice Book § 752 may "adversely affect a defendant's ability to cross-examine . . . witnesses and thereby infringe upon his constitutional right of confrontation." *State* v. *Williamson*, 212 Conn. 6, 20, 562 A.2d 470 (1989). In determining whether cross-examination has been impaired, our Supreme Court has considered such factors as the trial or reviewing court's access to the unproduced material, the declarant's adoption of a counterpart transcript within a short time after making the statement, and the extent to which the defendant's conviction rested on the testimony of the witness whose pretrial statement was destroyed. *State* v. *Belle*, supra, 215 Conn. 269–70. It is also appropriate to consider whether other impeachment material was available to the defendant. *State* v. *Cerilli*, 222 Conn. 556, 580, 610 A.2d 1130 (1992). Absent a showing that a defendant's constitutional right of confrontation was violated by the destruction, the state need prove only that it was more probable than not that the nonproduction was harmless. Where the inability to produce a statement so adversely affects the defendant's ability to cross-examine the witness that his confrontation rights are infringed, the state must prove harmlessness beyond a reasonable doubt. *State* v. *Belle*, supra, 269–70.

One of the factors in determining whether the nonproduction of Varella's taped statement interfered with the defendant's right to confrontation is whether Varella adopted a counterpart transcript within a short time after making the statement. The trial court found that the only tape of the interview was the one made at the Hamden police station. This tape was transcribed and signed by Varella one day later. There is little or no likelihood that the taped interview and the transcript

of the interview differed. Furthermore, while Varella's testimony was important in implicating the defendant in the burglary, the defendant's conviction did not rest solely on her testimony.

This leads us to conclude that the failure to produce the tape did not so adversely affect the defendant's ability to cross-examine Varella that it infringed on his constitutional right of confrontation. Accordingly, the standard to be applied to the harmless error inquiry is whether the state has met its burden of proving that it is more probable than not that the nonproduction of the tape was harmless. *State* v. *Johnson*, 214 Conn. 161, 175, 571 A.2d 79 (1990). In applying the balancing test set forth previously, we must weigh the state's culpability in the destruction of the tape-recorded statement against the prejudice suffered by the defendant as a result of that destruction to determine whether the trial court abused its broad discretion in denying the defendant's motion to strike. We conclude that the trial court did not abuse its discretion.

Varella reviewed and signed the typed statement, which the trial court found identical to the taped statement given the previous day. It is unlikely that the tape would have revealed anything different. Our review of the whole record leads us to conclude that the destruction of the tape was harmless because the result would not have been different had it been preserved. *State* v. *Belle*, supra, 215 Conn. 268. The court did not abuse its discretion in failing to strike Varella's testimony.

B

The following facts are relevant to the defendant's claim regarding Henrietta DiLauro. Following DiLauro's direct examination, the state gave to the defendant the typewritten statement that DiLauro had given to the police on the day of the burglary ten years earlier. During voir dire by the defendant, DiLauro indicated that

the police had taken notes while interviewing her at home. DiLauro stated that these notes were read back to her and she acknowledged that they were truthful and correct. She also stated that she signed a typed copy of her statement at the police station. When questioned by the state, she indicated that she had not signed anything at her house and that the typed statement was the only written statement that had been read to her and that she had signed. On continued examination by the defense, she testified that the police took notes at her house but did not read those notes back to her. The defendant did not move to strike her testimony at this time.

Following Polzella's testimony, the defendant asked to see the notes of his interview with DiLauro at her house. Polzella indicated that any notes taken ten years earlier were no longer in his possession because he destroyed his notebooks when they were filled. He also stated that he probably wrote only the victims' names, address and dates of birth, as that was his usual habit. Durkin testified that he also had taken notes when interviewing the victims. He stated that those notes were destroyed, but the contents had been condensed in his reports that had already been furnished to the defendant.

Although the defendant objected to his not being furnished with the police notes concerning the DiLauro interview, the defendant never moved to strike her testimony.[5] Because the defendant neither objected to

[5] The defendant did move to strike Durkin's testimony because of the destruction of his field notes. The court's denial of this motion is not before us on appeal. Regarding DiLauro's testimony, the defendant argues that it should have been stricken without the defendant's having to request it. We find this argument to be without merit. "The appropriate sanctions for the state's failure to comply with discovery are set forth in Practice Book § 755, which requires the trial court either to strike the testimony of the state's witness or to declare a mistrial, if the defendant seeks it and the interests of justice require it." *State* v. *Cecarelli*, 32 Conn. App. 811, 823, 631 A.2d 862 (1993).

DiLauro's testimony nor sought to strike it, we will not review his claim that the trial court improperly did not strike the testimony. See Practice Book § 4185.[6]

The defendant also claims that the state's failure to produce DiLauro's statement deprived him of the opportunity to cross-examine her effectively. We do not agree. The trial court found that DiLauro's typed and signed statement made at the police station on the day of the crime was the only statement that DiLauro had made. The record supports this determination.[7] Further, the principal issue in this case was one of identity. DiLauro's testimony in no way identified the defendant or anyone else. Her testimony merely related the facts of the burglary without implicating the defendant. Our review of the whole record shows that the state's failure to produce the field notes relative to the DiLauro interview did not so adversely affect the defendant's ability to cross-examine her that it infringed on his constitutional right of confrontation. Also, it is more probable than not that the nonproduction of the notes was harmless. See *State* v. *Cecarelli*, 32 Conn. App. 811, 824, 631 A.2d 862 (1993).

## II

The defendant next claims that the trial court improperly admitted, through the testimony of Varella, statements made during a conversation that Varella had had with the defendant and Sanders. Varella testified as to aspects of this conversation, which occurred in the

[6] Practice Book § 4185 provides in pertinent part: "The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

[7] While it seems clear that the officers took field notes at the time of the first response to the house, field notes are not statements unless they are signed or otherwise adopted. See *State* v. *Belle*, supra, 215 Conn. 266. The record does not indicate that the notes were signed or otherwise adopted in this case.

car as Varella, Sanders and the defendant drove away from the bank. She stated that there was no question in her mind that both Sanders and the defendant had participated in the conversation, and that neither man had disavowed or disagreed with anything the other had said. She could not recall, however, exactly who had said what. The defendant posits that because Varella could not be specific as to which man had said what, Varella's testimony that "they" discussed the robbery should not have been allowed. Citing *State* v. *John*, 210 Conn. 652, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989), the trial court admitted the entire conversation.[8]

"An admission may be introduced only against the party who made the admission. . . . An accused can be held to have adopted a statement as his own, however, when his conduct indicates that he assents to or adopts a statement made by another person." (Citation omitted.) Id., 682–83. Such an adoption must be demonstrated by conduct or statements that are " 'unequivocal, positive and definite in nature, clearly showing that in fact the defendant intended to adopt the hearsay statements as his own.' " *State* v. *Morrill*, 197 Conn. 507, 537, 498 A.2d 76 (1985). Even if a defendant makes no response to a statement made within his hearing, that statement may be introduced when the circumstances show that he heard and understood the statement, had the opportunity to speak and circumstances naturally called for a reply from him if the statement was not true. Id., 535. "Such an admission by one cries out for denial by

---

[8] In *State* v. *John*, supra, 210 Conn. 682, our Supreme Court affirmed the trial court's decision to admit the testimony of a witness concerning admissions that had been made by one or both of the defendants while riding in the witness' car. The court held that the statements, whether attributable to one or the other defendant, were admissible against both under the adoptive admissions exception to the hearsay rule.

the other. In the absence of such a denial, it is admissible as an admission against both." *Festo* v. *Luckart*, 191 Conn. 622, 632–33, 469 A.2d 1181 (1983).

Our review of the record discloses that the defendant either made the accusatory statements or heard them and did not disavow them. The trial court found that both the defendant and Sanders had participated in the conversation, and neither had disavowed what the other said. The statements were accusatory in nature and involved a brutal crime. Such statements would naturally have required a response if the listener had not participated in the alleged crimes. The main conversation took place in the privacy of a car, a small space in which conversation could easily be heard and where no police or unfriendly witnesses were present. The fact that both men participated in the conversation indicates that they understood each other's statements and had an opportunity to reply. See *State* v. *John*, supra, 210 Conn. 684. We conclude that Varella's testimony was admissible under the adoptive admissions exception to the hearsay rule.

The defendant argues that to allow hearsay under an adoptive admission "requires a more stringent and specific showing of assent" and that *Festo* is probably not good law today. *Festo* is Supreme Court precedent. This court will not reevaluate Supreme Court precedent. *State* v. *Cecarelli*, supra, 32 Conn. App. 825.

### III

The defendant claims that the trial court improperly admitted, as evidence of flight, testimony that the defendant was found in Florida two years after the crimes. He contends that there was no evidence of flight in this case. The crimes occurred on July 15, 1982. The defendant was found in Florida in July, 1984. There was no evidence as to when the defendant departed for Florida.

Flight, when unexplained, tends to prove a consciousness of guilt. *State* v. *Ferraro*, 176 Conn. 508, 516, 408 A.2d 265 (1979). When considered together with all the facts of the case, flight may justify an inference of the accused's guilt. *State* v. *Rosa*, 170 Conn. 417, 433, 365 A.2d 1135, cert. denied, 429 U.S. 845, 975 S. Ct. 126, 50 L. Ed. 2d 116 (1976). It does not, however, raise a presumption of guilt. *State* v. *Fernandez*, 27 Conn. App. 73, 90, 604 A.2d 1308, cert. denied, 222 Conn. 904, 606 A.2d 1330 (1992). Flight may be established by proof of efforts by the police to apprehend the accused. Such proof, however, must be supported by evidence that the defendant knew he was wanted by the police. *State* v. *Ferraro*, supra, 517. " 'Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration.' " *State* v. *Wright*, 198 Conn. 273, 281, 502 A.2d 911 (1986).

Here, there were several pieces of evidence that supported consciousness of guilt. The evidence showed that the police made unsuccessful efforts to locate the defendant immediately after the crimes. In addition, there was testimony that shortly after the crimes the defendant had indicated that the police would not find him. There was also evidence presented that the defendant had used an alias. Under these circumstances, the fact that the state could not prove when the defendant had gone to Florida is not significant. A lapse in time between the commission of the crimes and the flight, whenever that might have occurred, should not affect the admissibility of the evidence of flight. The evidence was sufficient to support an inference that the defendant was in Florida for the purpose

of avoiding arrest in Connecticut.[9] Evidence that the defendant was found in Florida in 1984 could be admitted as relevant to the issue of flight.

## IV

The defendant's final claim is that the trial court improperly allowed into evidence an affidavit, a fingerprint card bearing the name James Dawson, and a photograph of the defendant.[10]

The following facts are relevant to this claim. The affidavit of Sergeant Thomas Barnes, records supervisor of the Chicago police department, was offered to establish the foundation for admitting the fingerprint card. The purpose of admitting the fingerprint card was to establish that the defendant was the owner of a bankbook found at the scene of the crime. This bankbook was issued to "James Dawson." During voir dire, Raymond Brodeur, an inspector from the state's attorney's office testified that he spoke to Barnes about the alias "James Dawson" on the defendant's record. He was told that the fingerprint card and mug shot were made and kept in the normal course of police business. Barnes sent his affidavit to this effect, along with the certi-

[9] The court instructed on consciousness of guilt, mentioning all the evidence and not only the defendant's apprehension in Florida. The court also charged as to the function of the jury in this regard, and noted that flight does not create a presumption of guilt. The jury instruction provided in part that the jury should consider "the length of time between the offense and the first evidence that the defendant had at some point traveled to Florida, that there may be reasons for this fully consistent with innocence. You may include the fact that we live in a mobile society." The court's instruction clearly stated that consciousness of guilt was but one permissible inference to be drawn from the evidence of flight.

[10] The defendant, while not challenging the admission of the photograph in his main brief "as a result of counsel's oversight," raises that challenge in his reply brief and asks that we review this part of the issue. We do so, noting no prejudice to the state because the issues presented by the admission of the photograph are fully analyzed in the parties' briefs.

fied copies of the other documents. The state offered the documents either as business records or as being sufficiently reliable to be admissible under the residual exception to the hearsay rule. The court found the documents reliable and concluded that it was in the interest of justice to admit the documents under the residual or catchall exception to the hearsay rule.

The trial court has broad discretion in determining the relevancy of evidence. *State* v. *Fritz*, 204 Conn. 156, 167, 527 A.2d 1157 (1987). We afford a trial court's ruling on the admissibility of evidence great deference. *State* v. *Sharpe*, 195 Conn. 651, 659, 491 A.2d 345 (1985). Its evidentiary rulings will be set aside only where there has been a clear abuse of discretion. *State* v. *Holliman*, 214 Conn. 38, 50, 570 A.2d 680 (1990). Every reasonable presumption should be given in favor of the trial court's ruling. *State* v. *Shindell*, 195 Conn. 128, 136, 486 A.2d 637 (1985).

"An out of court statement is hearsay when it is offered to establish the truth of the matters contained therein. . . . As a general rule, hearsay evidence is not admissible unless it falls under one of several well established exceptions. . . . The purpose behind the hearsay rule is to effectuate the policy of requiring that testimony be given in open court under oath, and subject to cross-examination. . . . The residual, or catchall, exception to the hearsay rule allows a trial court to admit hearsay evidence not admissible under any of the established exceptions if: (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions. *State* v. *Sharpe*, supra, [195 Conn.] 664 . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Oquendo*, 223 Conn. 635, 664, 613 A.2d 1300 (1992).

While the defendant does not challenge the ruling as to the reliability and trustworthiness requirement, he does challenge whether, under the first prong of the test, there was a reasonable necessity for the admission of the statements.[11] Our Supreme Court has stated that "the necessity requirement is met when, unless the hearsay statement is admitted, the facts it contains may be lost, either because the declarant is dead or otherwise unavailable, *or* because the assertion is of such a nature that evidence of the same value cannot be obtained from the same or other sources." (Emphasis added.) *State* v. *Sharpe*, supra, 195 Conn. 665.

The trial court recognized the reliability of the items and held that they should be admitted in the interest of justice. The court also noted that Barnes, although technically available, could not testify in place of the documents, and to bring him "all the way from Chicago, merely to ask him the foundation questions to qualify a business record, to . . . go through that expense and trouble which would result in I suspect not a single question on cross-examination" would not be reasonable.

The reasonable necessity requirement is met when common sense demonstrates that the documents are considered sufficiently trustworthy to be admissible and there appears to be no justifiable need for cross-examination of the witness, not the declarant, in the traditional sense.

The trial court determined that the evidence was relevant, that it was necessary to the resolution of the case, that the documents were reliable and trustworthy, and that they should be admitted in the interest of justice.

---

[11] The state argues that neither the fingerprint card nor the mug shot is a statement and therefore that neither is hearsay. We find this argument to be unpersuasive. The trial court treated both as hearsay and ruled accordingly.

While the court did not elaborate on which of the alternatives it considered in satisfying the necessity requirement, the fingerprint card and mug shot are the type of evidence that speaks for itself, requiring no cross-examination. Evidence of the same value could not have been obtained from any other source. The affidavit by Barnes accompanied the card and photograph and was admitted solely for the purpose of explaining that they were true, accurate copies of the originals and that they were kept in the usual course of police business of the Chicago police department. "There is no procedural canon against the exercise of common sense in deciding the admissibility of hearsay evidence." Id., 665–66, quoting *Dallas County* v. *Commercial Union Assurance Co.*, 286 F.2d 388, 397 (5th Cir. 1961).

We therefore conclude that the trial court did not abuse its discretion in admitting the evidence.

The judgment is affirmed.

In this opinion the other judges concurred.